In the Matter of the **ESTATE of Jennie F. ROLATER, Deceased.**

No. 47690.

Court of Appeals of Oklahoma, Division 2.

Oct. 14, 1975.

Released for Publication by Order of Court of Appeals Nov. 6, 1975.

Francis M. Pickel, Jr., Oklahoma City, for appellees.

R. Dale Vliet, Norman, for appellant.

BRIGHTMIRE, Judge.

She would be one hundred years old were she still living—Jennie F. Rolater, lately of Norman, Oklahoma. But she isn't. And her death two years ago provided the event precipitating this lawsuit between her surviving kin; her estate, the subject matter.

Appellant, Edwin J. Barbour, brother of decedent and executor of her estate, seeks reversal of an order entered May 28, 1974, sustaining the objection of decedents' nieces and nephew to his final account and directing him to include therein for distribution under Jennie Rolater's will 200 shares of capital stock in City National Bank and Trust Company of Norman. The executor maintains his late sister gave this stock to him through his son, Mack E. Barbour, to whom Jennie had previously given a power of attorney.

We hold the trial court reached the right conclusion and affirm.

The operative facts were stipulated presenting only a question of their legal effect. On August 5, 1970, Jennie Rolater —then about 95 years old—executed a general power of attorney in favor of her nephew, Mack E. Barbour. The best we can make of the partially illegible Xerox copy the Cleveland County Court Clerk [1]

---

1. Routinely we get only Xerox copies of the original record and carbon copies of transcripts from Cleveland County, notwithstanding the law set out in 12 O.S.1971 § 990 and

furnished the appellate court is that the acknowledged and recorded instrument was prepared by filling the blanks of a printed form reciting: "That I, Jennie Rolater . . . appoint Mack E. Barbour . . . my true and lawful attorney, for me, and in my name, place and stead, and *to my use* to represent me and act for me in all matters public and private giving my said attorney full power to do everything whatsoever *requisite and necessary to be done in the premises* . . . hereby ratifying . . . all that my said attorney . . . shall *lawfully* do, or cause to be done, by virtue hereof." (emphasis added)

So far as the record discloses nothing was done by the empowered attorney until July 1, 1973, when he wrote a letter to the chairman of City National's board of directors saying: "Per instructions and desire of Mrs. Jennie Rolater request that you transfer on your books all City National Bank stock in her name, (Jennie Rolater) to E. J. Barbour and or Mack E. Barbour effective this date. Sincerely yours, Mack E. Barbour, Power of Attorney, Jennie Rolater."

On July 7—by which time the bank had received his letter—Mack Barbour delivered to the bank all the stock certificates he had, namely, 100 shares. These he made out in the name of Edwin J. Barbour by Mack Barbour as attorney in fact for Jennie Rolater and orally instructed that 200 shares be issued to Edwin Barbour, thinking the bank had the other 100 shares resulting from a 100 percent stock dividend issued five months earlier on February 1. But the bank did not have. It had sent the certificate representing the stock dividend to Robert W. Barbour (an appellee) who retained possession of it until July 11 when, at the request of Mack Barbour, he delivered it to the bank. On this date Mack Barbour also signed the repossessed certificate "Jennie F. Rolater by Mack E. Barbour, Attorney in Fact" naming Edwin J. Barbour as transferee.

Jennie Rolater died July 9. Apparently unaware of this development, the bank chairman on July 11 dispatched a response to Mack Barbour's letter reading: "Please refer to your letter relating to the Jennie Rolater stock. It will be necessary to bring in the original certificates of her stock together with a certified copy of your Power of Attorney. We will submit these to our legal counsel to determine proper procedure for going ahead with the transfer. Very truly yours, Chairman."

On this date the per share value of the stock was $300.

Edwin Barbour became executor of Jennie Rolater's estate under a will executed March 21, 1967, devising to a nephew, Loys D. Barbour (son of her deceased brother James), her 200-acre Texas farm and $1,500 cash and bequeathing the residue as follows: "One-fifth thereof to the children of my deceased brother, R. S. Barbour, namely: [the three appellees] . . . ; One-fifth thereof to the children of my deceased brother, Wiley Barbour . . . ; One-fifth thereof to the children of my deceased brother, Ben H. Barbour . . . ; One-fifth thereof to the children of my deceased brother, John W. Barbour . . . ; One-fifth thereof to my brother, Edwin J. Barbour." In the next article the testatrix explained that she made no provision for her sister, Myrtle Wey, because she is the beneficiary of a substantial amount under the will of a deceased sister, Kate C. Barbour.

In November the executor filed an inventory verifying it set out "all the estate."

Rule 1.25 of Rules of Appellate Procedure in Civil Cases, 12 O.S.1971, Ch. 15 App. 2 imposing a duty upon court clerks, once a designation is made, to "assemble in chronological sequence all of *the instruments* on file which have been designated . . . [and these] instruments bound by the clerk, together with the *original* of the court reporter's transcript [properly indexed and certified] and exhibits . . . *shall constitute the record on appeal.*" (emphasis added)

It was valued at only $18,245.71 as of July 9 consisting of $4,245.71 cash and $14,000 in certificates of deposit. On November 1 the executor filed a final report and petition for final distribution. On November 27 appellees filed an objection to final "account" (which final account the court clerk did not include in the record) on the ground that neither it nor the inventory included the 200 shares of bank stock valued at about $60,000.

The executor's written response to this was: "Prior to the death of Jennie F. Rolater . . . *she*, acting through her Attorney-in-Fact, Mack F. Barbour, directed the transfer of all of her shares in [the bank] to Edwin J. Barbour, and at the time of death [she] was not the owner of any shares in said bank." (emphasis added)

Following the submission of written brief, the trial court on May 28 sustained appellees' objections and ordered the 200 shares of bank stock distributed as estate assets.

Two related propositions are advanced by appellant in support of his attack on this order: (1) Mack Barbour, acting under his power of attorney, completed a valid inter vivos gift to his father on July 7 of the original 100 shares he had in possession; and (2) another valid inter vivos gift of the second 100 shares was effected by the same parties on July 11.

With regard to his first point appellant's argument goes something like this: The requisites for a valid inter vivos gift according to *Frazier v. O.G. & E. Co.*, 178 Okl. 512, 63 P.2d 11 (1936) are: (a) donative intent, (b) delivery of the gift, and (c) donor must strip himself of all ownership and dominion over the subject matter. Such delivery need not be actual but may, as in the case of stock for instance, be accomplished by transfer to the donee on the books of the corporation at "the direction of its owner." There was a transfer on the bank books; therefore, a valid gift was effected.

■ Because of the view we take of the problem, it is unnecessary to dwell at length upon the subject of when and how corporate stock is delivered except to say that neither manual delivery of a certificate nor registering of a transfer on the corporate books is controlling absent facts or circumstances demonstrating the first essential—donative intent of the certificate owner. And in examining the record for such evidence some other significant principles mentioned in *Frazier* should be borne in mind. The first one is that there is "no presumption of any intention to give" but this essential element like the others must be proved by evidence that is "clear, satisfactory, and unmistakable." The second one is that the burden of adducing such proof lies with "the alleged donee."

■ Here there is no evidence that Jennie Rolater ever intended to give any of the bank stock to anyone, except testamentarily. The letter written by Mack Barbour on July 1 certainly does not supply it. Assuming the self-serving document has some probative value, the most it can prove is that for some undisclosed reason deceased wanted the bank to reregister her stock in the names of "E. J. Barbour and or Mack E. Barbour"—which, incidentally, has never been done. To permit finding a donation was intended such instructions would have to be coupled with some hard evidence or cogent circumstances that indeed she, Jennie Rolater, not her agent, ordered a stock transfer registration as a consumative act of giving the stock to E. J. "and or" Mack Barbour—terminology which precludes the reader from knowing exactly to whom the requested transfer was intended.

As a matter of fact such recorded information as we have strongly suggests Jennie Rolater did not intend to give any of the bank stock to her brother. First of all, on July 1 her 98 years of life on earth was destined to end in a few days from "lobar pneumonia . . . as a consequence of senility"—in other words, a lung disease

which overwhelmed her because of feebleness of body and mind associated with old age—circumstances which discourage the image of a woman capable of suddenly initiating a program aimed at divesting herself of over 80 percent of her estate by giving it to her brother.

Secondly, if indeed she possessed sufficient mental capacity to ordain such a transaction, it seems to us the alleged donee owes some plausible explanation as to why she would just up and decide on July 1, 1973, to depart so radically from what appears to have been a carefully thought out plan of estate disposition established by the will she executed less than three years before—an explanation which is conspicuous by its absence here.

Thirdly, there is absent any attempt on the part of appellant to adduce testimony or any other type evidence regarding the alleged donor's physical and mental condition on July 1 or her expressed wishes, desires and directions.

■■■ While certainly not articulated by lawyer or client, we get the impression that appellant and his son proceeded under the apprehension that the power of attorney in question gave its possessor more or less omnipotent control of his principal's property. If so, of course, the notion was ill-founded. The term "power of attorney" has taken on a distinctive meaning in legal parlance and refers to an instrument authorizing another to act as one's agent or attorney in fact (as distinguished from an attorney at law). Black's Law Dictionary 1334 (Rev. 4th ed. 1968). In scope the proxy may be by its own terms general or limited to specified authority. It may be further restricted or controlled by statute[2]

or by operation of decisional law. Moreover, the instrument creating the special agency will be strictly construed. *Kuite v. Lage,* 152 Mich. 638, 116 N.W. 467 (1908); *Garibaldi Bldg. & Loan Ass'n v. Garibaldi League,* 111 N.J.Eq. 365, 162 A. 419 (1932); *Luikart v. Boland,* 45 Wyo. 461, 21 P.2d 542 (1933).

■■■ In exercising granted powers, the attorney is bound to act for the benefit of his principal avoiding where possible that which is detrimental unless expressly authorized. Thus it was held that a general power of attorney authorizing the agent to attend to all the affairs of the principal including the execution of any notes necessary in connection therewith, does not include power to sign the principal's name as surety. *Clinton v. Hibbs,* 202 Ky. 304, 259 S.W. 356 (1924). Neither does a power to wind up a mercantile business include power to go in debt for or to purchase real estate. *Fisher v. Salmon,* 1 Cal. 413, 54 Am. Dec. 297 (1851). And, more pertinent to our inquiry here, such granted power carries with it no authority to make a gift of the principal's property in the absence of an explicit direction. *Succession of Mc-Crocklin,* 242 La. 404, 137 So.2d 274 (1962); *Brown v. Laird,* 134 Or. 150, 291 P. 352, 73 A.L.R. 877 (1930); *Huntsman v. Huntsman,* 56 Utah 609, 192 P. 368 (1920).

■■■ So here the question is not whether the change of names on the bank stock records was sufficient to transfer title, but whether Mack Barbour had authority to give the stock to his father. As we have seen, the agent operated under a power of attorney wherein his aunt said she was authorizing him "*to my use* to represent me

2. For example, 16 O.S.1971 § 20 & 21 establishing requirements of a power of attorney relating to real property.
   And in 1965 Oklahoma adopted the model "Special Powers of Attorney" act, 58 O.S. 1971 § 1051 et seq. This permissive law prescribes the ways and means of executing a power of attorney by a competent person "in anticipation of or because of infirmity

resulting from injury, old age, senility, blindness, disease or other related or similar cause as a means of providing *for the care of* [the principal's] person or property, or both . . . .." (emphasis added) The purpose of the act is said to provide a means of preventing automatic termination of a power of attorney upon the principal becoming incapacitated.

and act *for me* in all matters public and private." (emphasis added) This language carries with it no implied power to give her property away. Nor does there exist any circumstantial basis for such an implication inasmuch as the attempted donation was not for the principal's use or benefit. And, since there is no evidence of any express authority for the transfer the very first essential element of a valid inter vivos gift is missing—donative intent—thereby nullifying the attempted gift as to all 200 shares.

The trial court therefore correctly ordered the stock distributed as an estate asset.

Affirmed.

NEPTUNE, P. J., and BACON, J., concur.