366 So.2d 768 (1978)
Raymond H. HODGES, As Personal Representative of the Estate of Charles Albert Giramaire, Deceased, Appellant,
v.
Rachael B. SURRATT, Samuel Walter Surratt, Jr., and Flagship Bank of Zephyrhills, Appellees.
No. 77-1745.
District Court of Appeal of Florida, Second District.
December 13, 1978.
Rehearing Denied January 26, 1979.
*769 Jerry A. DeVane of DeVane & Allen, Lakeland, for appellant.
H. Clyde Hobby of McClain & Hobby, Dade City, for appellees Surratts.
Tom Ross of Sumner, Tyner, Williams, McKnight & Ross, Dade City, for appellee Flagship Bank of Zephyrhills.
OTT, Judge.
The personal representative of the Estate of Charles A. Giramaire brought an action against Mr. and Mrs. Surratt jointly for fraud, undue influence, conversion and imposition of a constructive trust. The action was brought against Mrs. Surratt individually for breach of fiduciary duty and to void or set aside the various transfers of real and personal property that resulted therefrom. In due course, the case came on for trial by jury. At the conclusion of the plaintiff's case, the lower court granted Mr. Surratt's motion for directed verdict and ultimately entered a final judgment in his behalf. The case against Mrs. Surratt was submitted to the jury and resulted in the return of the following special verdict:
(1) Do you find from the greater weight of the evidence that the Defendant, Rachael B. Surratt, exerted undue influence on [Giramaire] in order to obtain the signature of [Giramaire] on the Bank Account Signature Card?  Yes.
(2) Do you find from the greater weight of the evidence that the only purpose for which [Giramaire] signed the Bank Account Signature Card was to permit the Defendant, [Mrs. Surratt] to pay the bills of [Giramaire]?  Yes.
(3) If you have answered yes to either (1) or (2) above, do you find from the greater weight of the evidence that any of such acts of [Mrs. Surratt] caused any damage to the plaintiff?  Yes.
The jury also awarded $25,000 damages against Mrs. Surratt.
*770 The lower court ultimately entered judgment for Mrs. Surratt notwithstanding the above verdict.
We reverse and set aside the judgment of the lower court in favor of Mr. Surratt and Mrs. Surratt. We reinstate the jury verdict against Mrs. Surratt. In addition, we reverse the directed verdict entered in favor of Mr. Surratt. We find no error in the summary judgment entered before trial in favor of Flagship Bank of Zephyrhills.
The facts of the case are as follows. Mr. and Mrs. Surratt, appellees, were neighbors of Mr. Giramaire. According to their testimony, Mr. Giramaire executed a will in 1971 that was prepared by Mrs. Surratt and executed on May 31, 1971 at a time when Giramaire's wife was still alive. A copy of this will was received into evidence. Paragraph 6 of the 1971 will provided:
In the event my wife, Vivian Gertrude Giramaire, [predeceases] me, then I hereby give, devise and bequeath to Rachael Britts Surratt and Samuel Walter Surratt, Jr. all my estate, whether real, personal or mixed, wheresoever located, of which I may die seized or possessed ...
Rachael Surratt was appointed as executrix of this 1971 will in the event Mrs. Giramaire was unable to serve for any reason. After Mrs. Giramaire's death, Mr. Giramaire consulted an attorney (appellant/Hodges) and a new will was prepared and executed on May 19, 1972. The 1972 will expressly revoked all prior wills. Mr. and Mrs. Surratt were not mentioned in this will and had no knowledge thereof until after Mr. Giramaire was hospitalized. Under the 1972 will the residue of the estate was left to the Bank of Pasco County, in trust, for the sight conservation work and other assistance to the blind by the Lions Club of Zephyrhills, Florida. In the 1972 will Hodges was appointed to be executor with a bank trust department named to be executor if Hodges could not serve.
Giramaire became ill and was taken to the hospital by another neighbor  Mr. Sbraccia  on November 19, 1975. At Mr. Giramaire's instance Mr. Sbraccia evaded the inquiry of the Surratts that evening as to the whereabouts of Mr. Giramaire. Upon learning that the Surratts had entered Mr. Giramaire's home Mr. Sbraccia decided to tell them of his hospitalization and did not want to be further involved. Once the Surratts learned of Giramaire's hospitalization they began to visit him with great frequency. Mr. Surratt testified that he was "there every day" and stated that his wife was at the hospital practically all of the time  even more than he was.
On the day Mr. Sbraccia took Giramaire to the hospital he was given various personal effects, i.e., some papers, a billfold, checkbook and keys to the house and car. Giramaire requested that Sbraccia deliver all these items to his attorney, appellant/Hodges. Later, Sbraccia sought to return the items to Giramaire and extricate himself from further involvement due to his long-standing acquaintance with the Surratts. Mr. Giramaire tearfully prevailed on Mr. Sbraccia to deliver everything to his attorney, Mr. Hodges.
On the Saturday following Giramaire's hospitalization Mrs. Surratt called Hodges. Hodges was not at home. He eventually returned her call that evening. According to Hodges "[s]he told me that Mr. Giramaire was  first of all she wanted to know if I had made a will for him  told me he was in the hospital and not expected to live." Hodges promised to go to his office the next day (Sunday) and check on it. He did so, but could not find the will. He called Mrs. Surratt to tell her this. On Monday he found a copy of the will. He called Mrs. Surratt and told her that he had found a copy.
Mrs. Surratt's testimony on this point was  at the very best  forgetful. The following colloquy occurred:
Q. Did you also tell Mr. Hodges at this point that you understood he had prepared a will for [Giramaire]?
A. I told him I understood that he [Giramaire] had been to him to seek advice. I don't remember what I said about a will or what.
Counsel then referred to Mrs. Surratt's prior deposition testimony as follows:

*771 Q. On page 11, line 23 [of the deposition] do you remember the following question and your answer 
Q. And did you further tell him that Mr. Hodges had prepared a will for Mr. Giramaire.
A. I said I understood he had.
A. I probably did say that.
Sbraccia testified that Giramaire had asked him to go into his house and clean out the refrigerator. When Sbraccia did so, he found the refrigerator to have been already cleaned out. Mrs. Surratt testified that it was she who went into Giramaire's house and cleaned out his refrigerator. Although Mrs. Surratt testified that she did not find a copy of the 1972 will in Giramaire's house until after Giramaire's death, the record points strongly to a contrary conclusion. In further cross-examination of Mrs. Surratt, counsel once again made reference to her deposition:
Q. On page 13, line 21  do you recall the following question and answer 
Q. And in this conversation ... with Mr. Raymond Hodges at the time Mr. Giramaire was hospitalized, did you also tell Mr. Hodges that you believed he had prepared the will because you had a copy?
and your answer 
A. Correct. [Emphasis supplied.]
Mr. Surratt's testimony on this point is also informative:
Q. [Y]ou say that this [the 1972 will] was found by Mrs. Surratt in the house, is that correct?
A. Yes, sir.
Q. And at what time was this?
A. I couldn't tell you the time.
Q. Was it during the period of time that Mr. Giramaire was in the hospital?
A. I presume it was but I couldn't tell you the time.
Mrs. Surratt testified that she could not remember whether or not she read the 1972 will when she found it. She testified that "I could not say whether ... I read it or not." She also testified that "I couldn't swear that I did or didn't [read it]." In addition, Mr. Surratt stated that he "seen [sic] it ... looked at it but ... haven't ever read it."
The Surratts claimed an oral agreement was made with Giramaire on November 28, 1975 by which they were to receive all of his property in return for looking after him for the remainder of his life.
On the next day  November 29  Giramaire signed two documents. The first document was a power of attorney. This document was totally handwritten on one lined sheet of stenographic pad paper and read as follows:
I hereby appoint Rachael B. Surratt with my power of attorney to act [with] full power [and] authority.
This document was notarized and the notary acknowledgment was typed. However, it is quite clear from the record that the document was notarized out of Giramaire's presence. Moreover, the nurse who witnessed the execution of the document specifically testified that the notary was not present for the execution of the document.
The second document executed on November 29 was a bank signature card. This was an authorization by the depositor for adding Mrs. Surratt as an additional authorized signatory to the account.
Both of these documents were witnessed by Dr. Brownlee and Nurse Parsons. Their testimony was quite clear that the power of attorney and bank signature card were executed at the same time and were given or signed only for the purpose of allowing Mrs. Surratt to pay current bills and handle the affairs of Giramaire while he was in the hospital  not for the purpose of turning over all assets to the Surratts. As stated by Nurse Parsons:
Q. How did you come about to sign the power of attorney?
A... . Mrs. Surratt asked . . if we would just witness her signature so she could pay his current bills while he was in the hospital and he wouldn't have to worry about his lights and water and *772 so forth [being] shut off. [Emphasis supplied.]
Nurse Parsons also stated that:
Mrs. Surratt wanted to take care of his current affairs to relieve him of the responsibility and the worry while he was in the hospital.
On December 2, Mrs. Surratt utilized the power of attorney to convey to Mr. Surratt all of Giramaire's real and personal property  the only exception being the bank account for which she had secured the bank signature card. This account she appropriated to herself. The conveyances to her husband were by a warranty deed (the consideration was marked as "gift") and a certificate of transfer of ownership, all of which were drawn and executed by Mrs. Surratt "with Power of Attorney for Charles A. Giramaire."
On December 1, Mrs. Surratt attempted to use the power of attorney to gain entry into Giramaire's safe deposit box. The bank denied entry into the safe deposit box based only on the power of attorney. On December 5, Mrs. Surratt gained entry into the safe deposit box by presenting an "appointment of co-owner" form. This form did not bear the normal signature of Giramaire but was executed by him with an "X". The only witness to this execution was Mr. Surratt.
On December 9, Giramaire died. He left no living relatives.
The jury found that Mrs. Surratt exerted undue influence on Giramaire in order to obtain his signature on the bank account signature card and that the only purpose of the execution of both documents was for Mrs. Surratt to pay his current bills.
In its judgment non obstante veredicto the lower court found that "there was no evidence adduced at trial that is legally sufficient to support a verdict for the Plaintiff." In any case such as this the jury has the right to ignore the uncorroborated testimony of the surviving interested parties. The record is completely devoid  outside the testimony of the Surratts  of any evidence, oral or written, to support the Surratt claim. To the contrary, all of the remaining evidence strongly supports the jury verdict.
The movant for judgment notwithstanding the verdict "admits all material facts as attested by his adversary" and "all inferences of fact favorable to the adversary that reasonably might be drawn from the evidence as a whole." Deese v. Whitebelt Dairy Farms, Inc., 160 So.2d 543, 545 (Fla.2d DCA 1964).
The granting of judgment notwithstanding the verdict indicates that one side of the case is essentially devoid of probative evidence. Deese, supra. In the instant case, there exist ample inferences of fact and probative evidence to support the jury verdict.
The record as a whole casts serious doubt on the propriety of Mrs. Surratt's actions during Giramaire's last days. It is clear that the jury could well conclude  as it did  that she violated her fiduciary duty as his attorney in fact. As hereafter pointed out we question whether the oral testimony of the Surratts, standing alone, is sufficient as a matter of law to supply the power to give away the assets of the decedent Giramaire under the general power of attorney. In addition, Mrs. Surratt's testimony was placed in substantial doubt in at least two instances: (1) with reference to whether she had a copy of the will when she called Hodges; and (2) with reference to whether she mentioned the will to Hodges in her telephone call to him. Moreover, her testimony that she did not find the will until after Giramaire's death was hardly credible in the light of her actions and her husband's testimony. Finally, it is difficult to accept her testimony that she did not remember whether or not she had read the 1972 will upon finding it. It hardly seems likely that a beneficiary of a 1971 will  who during the declining days of the testator finds a 1972 will  would not read it immediately or at least clearly recall that she refrained from doing so. The point is: Why would Mrs. Surratt call Hodges and ask about a will unless she had found the 1972 will; had she not found it, she would have assumed *773 that the 1971 will was still in effect and she and her husband were home free.
Another of the dubious activities engaged in by the Surratts concerns Giramaire's Airstream Trailer. Mrs. Surratt submitted the title to the Division of Motor Vehicles on December 19, 1975  10 days after Giramaire's death  for transfer to Mr. Surratt. She maintained that Giramaire gave it as a gift to her husband in 1971  some four years before. An incongruity exists in that the trailer remained on rented land (upon which Giramaire paid rent) from 1971 thru the time of Giramaire's death. Moreover, after Giramaire's death Mrs. Surratt wrote to the owner of the land upon which the trailer rested and told him that the Surratts had purchased the trailer. When questioned about this at trial, Mrs. Surratt maintained that this was simpler than stating that the trailer had been a gift.
Another aspect of the record supporting the jury verdict is found in the testimony of Dr. Brownlee and Nurse Parsons with reference to the purpose involved in the execution of the power of attorney and the bank account signature card. Their testimony is clear that the purpose of the execution of the documents was for the sole purpose of allowing Mrs. Surratt to pay Giramaire's bills for the short run  not to turn over all Giramaire's assets to the Surratts.
It is very difficult to believe that Giramaire intended for the Surratts to get all his property. He expressly excluded them from his 1972 will. In addition, his instructions and cautions to Sbraccia suggest his strong desire that Hodges (not the Surratts) be contacted with regard to his illness and be placed in possession of his home, car, checkbook and personal papers. Thus, the record is devoid of any evidence that Giramaire's clear donative intent was to give the Surratts all his property  except from the testimony of the Surratts themselves. The jury certainly was free to disregard or seriously discount their testimony  as it seems clear they did.
Mr. and Mrs. Surratt strongly argue that they separately and individually entered into agreements with Giramaire. However, this contention is belied by Mrs. Surratt's own testimony. She stated:
Q. Did  were you, in fact, to receive any benefits under [the November 29th agreement]?
A. Yes, sir, his checking account.
Q. And is it true that both you and your husband . .. had joint obligations under that agreement?
A. Yes, sir. [Emphasis supplied.]
It would exalt form over substance to separate Mr. and Mrs. Surratt in this affair. Not only is there Mrs. Surratt's above admission, but there are other indications in the record that they were acting in concert to systematically strip Giramaire of his assets. Obviously, Mrs. Surratt's use of the power of attorney to convey almost all of Giramaire's property to her husband indicates a jointness of action and purpose.
Aside from the evidentiary support for the jury's verdict as discussed above we think the power of attorney is fatally defective.
The term "power of attorney" has taken on a distinctive meaning in legal parlance and refers to an instrument authorizing another to act as one's agent or attorney in fact (as distinguished from an attorney at law). Estate of Rolater, 542 P.2d 219, 223 (Okl.App. 1975) citing Black's Law Dictionary 1334 (Rev.4th Ed. 1968).
The Fourth District Court of Appeal in Johnson v. Fraccacreta, 348 So.2d 570 (Fla.4th DCA 1977) faced the question of whether a general power of attorney can authorize an agent to make a gift of the principal's property. Our sister court stated that it had found no Florida case law directly on point. The court quoted the general rule announced in other jurisdictions:
"`A general power of attorney authorizing an agent to sell and convey property, even though it authorizes him to sell for such price and on such terms as to him shall seem proper, implies a sale for the benefit of the principal, and does not authorize the agent to make a gift of the property, or to convey or transfer it without *774 a present consideration inuring to the principal.'"
348 So.2d at 572 citing 73 A.L.R. 884 (1931).
In Fraccacreta the facts were as follows. Carmella Fraccacreta executed a power of attorney appointing her daughter, Delores, as her attorney in fact. Delores then conveyed real property owned by Carmella to Carmella and her husband Paolo as tenants by the entirety. The court held that this was a "gift to Paolo of a portion of Carmella's property by virtue of the creation of an estate by entireties with the right of survivorship." 348 So.2d at 572. The court held:
The court must look to the language of the instrument, as with any other contract, in order to ascertain its object and purpose. The language of the agreement must be construed in such a manner so as to carry out the intent of the principal. We find no language in the subject power of attorney which expressly or impliedly indicates an intention to authorize a gift of the principal's property. An agent has no power to make a gift of his principal's property unless that power is expressly conferred upon the agent by the instrument or unless such power arises as a necessary implication from the powers which are expressly conferred. Nor are we presented with any competent substantial evidence of those circumstances surrounding the execution of the power of attorney that might be utilized as an aid in the construction of the language contained in the instrument. [Emphasis supplied.]
348 So.2d at 572.
In Rolater the court stated the same principle in the following language:
In exercising granted powers, the attorney is bound to act for the benefit of his principal avoiding where possible that which is detrimental unless expressly authorized.
542 P.2d at 223. The facts were as follows. Jennie Rolater  then about 95 years old  executed a general power of attorney in favor of her nephew. The nephew conveyed bank stock to her brother (the nephew's father). The court held that there was no evidence that Jennie Rolater ever intended to give any of the bank stock to anyone except testamentarily. The court noted that there was a strong suggestion that she did not intend to give any of the bank stock to her brother.
In the landmark case of Brown v. Laird, 134 Or. 150, 291 P. 352, 353 (1930) the facts were as follows. At a time when Mr. Mitchell was very ill and, in the words of the court, "practically non compos mentis", his wife became his attorney in fact. In the words of the court "it required but little effort for Mrs. Mitchell to control the transaction involved in regard to the power of attorney ..." Mrs. Mitchell then executed a deed to her daughter (by a prior marriage) as a gift. This had the effect of disinheriting Mr. Mitchell's natural daughter, who was a beneficiary under the will. The court held that donative intent was lacking. The court stated that a power of attorney to sell was not the same as a power to make a gift. This wrongful use of the power of attorney constituted in the words of the court a "legal fraud." This decision goes on to hold that where an agent exceeds his authority under such a power of attorney even a bona fide purchaser is not protected.
It is unnecessary for us to decide whether we would go so far as the Oregon court as Mr. Surratt is clearly not a bona fide purchaser for value and in good faith. We simply hold that under the circumstances of this case Mrs. Surratt's transfers of property as gifts to her husband and the appropriation to her own use of the funds in the checking account were in violation of her fiduciary capacity in the absence of clear language to that effect in the document itself.
This court does not know why the special verdict forms propounded below omitted reference to the power of attorney. In any event, we hold that Mrs. Surratt  as agent for the deceased  exceeded her authority in conveying the majority of his property to her husband. The purported transfers of assets to Mr. Surratt under the power of attorney are void and are set aside for the reasons set forth above.
*775 The jury verdict against Mrs. Surratt is reinstated and the trial court is directed to enter judgment against Mrs. Surratt in accord therewith.
The directed verdict and judgment for Mr. Surratt are set aside and the case remanded for further proceedings as to Mr. Surratt, consistent herewith.
We affirm the summary judgment for Flagship Bank of Zephyrhills.
BOARDMAN, Acting C.J., and RYDER, J., concur.