**COUNCIL OF UNIT OWNERS OF PILOT POINT CONDOMINIUM (On Behalf of the Phase I Unit Owners), Plaintiff,**

v.

**REALTY GROWTH INVESTORS, Defendant.**

Court of Chancery of Delaware, Sussex County.

Submitted Feb. 23, 1981.

Decided Sept. 22, 1981.

John Terence Jaywork, of Hudson, Jones & Jaywork, Dover, and Stephen G. Johnakin, of Thomas & Sewell, Alexandria, Va., for plaintiff.

Richard B. Beck, of Morris, James, Hitchens & Williams, Wilmington, for defendant.

BROWN, Vice Chancellor.

The primary issue posed by this litigation is whether the recorded documents by means of which a parcel of real estate has been submitted to the provisions of the Delaware Unit Property Act can be amended without the consent of those persons who have already acquired real estate interests in the condominium project under the terms of the documents as originally recorded.

The facts of this matter are complex almost to the point of absurdity. The mess that has been created is difficult to believe. The situation represents another example of what can happen when real estate developers are given the unfettered power by statute to create real estate interests out of that which is not real estate in the traditionally accepted meaning of the term.

Because of this circumstance, I make no effort to set forth all of the relevant facts in any detail. To do so would cause anyone attempting to read this decision to lose interest long before arriving at the result to be reached herein. Accordingly, in recognition of the fact that counsel are aware of the particulars of the problem, I shall simply state the resulting conditions with which the Court must work in summary form, filling in such details as may be necessary wherever appropriate.

What has happened is that a 17.35 acre parcel of land has been leased for a term of 99 years and thereafter the entire tract has been submitted to condominium status pursuant to the Delaware Unit Property Act found at 25 *Del.C.* § 2201 et seq. The original developer and lessee, pursuant to documents filed and recorded with the Sussex County Recorder of Deeds in compliance with the Act, gave notice to all that the condominium project was to be developed in four stages, with only the plans for the first stage being finalized as of the time that the documents were recorded. The condominium project in issue is known as Pilot Point and it is located on the Delaware Bay in the City of Lewes. The City of Lewes is said to be the owner of the land. The City is the lessor under the 99-year lease and, in apparent compliance with 25 *Del.C.* § 2240, it executed the recorded documents along with the developer lessee so as to submit the property to the provisions of the Act.

Under what was designated as Phase I of the recorded plan, the original developer, Anderson-Stokes, Inc. ("Anderson-Stokes"), was to construct 32 town house units situated in five separate buildings. In fact it has done so and all 32 units have been sold and/or subleased, as the case may be, to various individuals. At the time that the condominium documents were recorded it was the intention of Anderson-Stokes to complete the project by constructing one 100-unit, high rise motel and two 50-unit garden court apartment buildings. The recorded documents so indicated, showing the location on the property of the initial five buildings which were to contain the 32 Phase I town houses and the tentative location of the other three buildings that thereafter were to contain the motel and apartment units.

The document which must be recorded in order to submit real estate to the Unit

Property Act is defined by the statute as the "declaration." 25 *Del.C.* § 2202(6); § 2203. The declaration must be accompanied by a "declaration plan" showing the property and the location of the buildings thereon, 25 *Del.C.* § 2219(4); § 2220, and the declaration plan must also be recorded. 25 *Del.C.* § 2225. Furthermore, the declaration must contain, among other things, a description of the common elements contained in the condominium and must contain also a designation of the proportionate undivided interests in the common elements expressed as a percentage assigned to each condominium unit, which percentages must aggregate 100 per cent. 25 *Del.C.* § 2219(5). In addition, the declaration must contain a statement that "the proportionate undivided interest in the common elements may be altered by the recording of an amendment duly executed by all unit owners affected thereby." 25 *Del.C.* § 2219(6).

In compliance with these statutory requirements, the declaration recorded by Anderson-Stokes apportioned the entire 100 per cent interest in the common elements initially between the 32 town house units that were to comprise Phase I. The declaration provided, however, that notwithstanding this initial assignment, the proportionate undivided interest in the common elements of the "unit owners" could be amended and reduced "for the sole purpose of including in said percentages the additional construction of not more than two hundred (200) units *as herein contemplated.*" In this regard, the declaration also provided that such reduction or change was to be accomplished "by the recording of an amendment to the Declaration duly executed by all unit owners affected by such changes pursuant to the provisions of 25 *Del.C.* § 2205 and 25 *Del.C.* § 2219(6) ...." However, this same provision of the declaration also provided that

"[A]ll unit owners, by the acceptance of a leasehold interest in Pilot Point, hereby consent to and do hereby appoint irrevocably Anderson-Stokes, Inc., *or its successors,* to change, amend, reduce or increase the proportionate undivided interest in the common elements by the recording of

an amendment to this Declaration executed by Anderson-Stokes, Inc., or its assigns, as attorney-in-fact for the unit owners, ...." (Emphasis added.)

With reference to the construction of additional units "as herein contemplated" the declaration indicated that Phase II, Phase III and Phase IV were in the planning stage and to this end the declaration expressly reserved to Anderson-Stokes

"... the right to erect *not more than three additional buildings* consisting of not more than a total of two hundred (200) units contained in said buildings ...." (Emphasis added.)

The right was further expressly reserved to Anderson-Stokes

"... to construct the additional buildings and the additional units, *as set forth herein,* and to amend and supplement this [sic] Declaration Plan to establish the exact site of each building ...." (Emphasis added.)

Finally, in describing the common elements in the condominium project as required by 25 *Del.C.* § 2219(6), the declaration recited, among other things, that the common elements included all of the 17.35 acres

"... not occupied by Phase I units, subject to a decrease in cubic area by virtue of the right of the Declarant to add *three additional buildings* ...." (Emphasis added.)

Subsequent to the construction and sale and/or sublease of the 32 town house units in Phase I, Anderson-Stokes either changed its name or was succeeded in interest by a corporate entity known as ASCO, Ltd. Thereafter, ASCO proceeded to develop Phase II of the Pilot Point complex. In so doing, however, it deviated from the original plan of Anderson-Stokes. Specifically, it built neither a high rise motel nor garden court apartments. Rather, on another nine acre portion of the tract it proceeded to construct *four* more buildings containing an additional 28 town house units. These additional 28 town houses were then sold and/or subleased to various other persons. Significantly, however, ASCO did this without

making any effort to amend the recorded declaration and declaration plan. It also did so without attempting to obtain the written consent of the owners and/or sublessees of the 32 Phase I town houses. At the same time, no objection or protest was made on behalf of the owners and/or sublessees of the 32 Phase I town house units.

Still later, ASCO apparently found itself in a position wherein it could no longer handle the obligation of a mortgage loan which had been granted to Anderson-Stokes with regard to Phase I. The mortgagee of this obligation was Realty Growth Investors, a Maryland real estate investment trust ("Realty Growth"), the present defendant in this litigation. The balance due was some $465,000.

As a result of this circumstance, a deal was struck by which ASCO conveyed to Realty Growth all of its remaining interests in the 99-year lease from the City of Lewes, with the exception of the nine acre portion compromising Phase II, which primary leasehold interest ASCO continued to retain. In return, Realty Growth satisfied the mortgage and cancelled the obligation of ASCO.

This transfer of the interest in the 99-year lease was considered by Realty Growth to have value for two reasons. In the first place, since Anderson-Stokes had developed the project as a lessee, it could only transfer a sublease interest in the underlying real estate to those acquiring the initial 32 Phase I town houses. In so doing, Anderson-Stokes attached an annual ground rent to each sublease. Thus each of the 32 town house units are required to pay an annual ground rent for each year remaining on the 99-year lease. These ground rents also carry with them redemption rights, which means that the annual ground rents can be terminated by the payment of a lump sum which, capitalized at a specified interest rate, would be sufficient to produce a yearly income equivalent with the amount of the annual ground rent. Secondly, Realty Growth assumed that it would be free to develop the remaining open land in the 17.35 acre tract by the construction of such additional units as it saw fit.

This latter premise had one snag in it, however, as Realty Growth apparently appreciated. Quite obviously, to deviate from or enlarge upon the original condominium plan of record it was necessary to amend the declaration and declaration plan recorded by Anderson-Stokes. Also, it apparently came to the attention of someone that something should be done about Phase II since it had been constructed and the 28 town house units sold and/or subleased in the absence of any modification of the recorded declaration and declaration plan. Also to be dealt with was the element of the potential consent required from those who had purchased and/or acquired town houses—at least to those in Phase I—since any change in the condominium plan would affect such existing rights in the common elements as they might have had.

As a result, and some three years after ASCO has assigned its interest in the 99-year lease to Realty Growth (except for its retained interests in the nine acre, Phase II parcel), ASCO and Realty Growth hit upon the following course of action. ASCO proceeded to record an amendment to the declaration originally recorded by Anderson-Stokes. Simultaneously, Realty Growth, as the owner of the remaining leasehold interest from the City of Lewes other than that retained by ASCO, recorded a document euphemistically denominated as its "Declaration of Acquiescence, Approval and Consent."

This amendment to the declaration by ASCO, as approved and consented to by Realty Growth, purports to do two things. First, it purports to alter the original declaration and declaration plan by bringing the 28 Phase II town houses within the condominium project. Second, it purports to amend the original declaration and declaration plan by revising Phase III and Phase IV so as to permit the construction of yet another *twelve* buildings containing up to 68 units, all of which are to be two-story town houses to be made available for sale and sublease to the general public.

This amendment to the original declaration *does not contain the written consent* of any of the purchasers and sublessees in Phase I. Rather, it recites that the amendatory action is being taken by ASCO pursuant to the irrevocable power of attorney granted to Anderson-Stokes or its successors by each Phase I unit owner by virtue of their acceptance of their leasehold (or sublease) interests in Phase I pursuant to the terms of the original declaration.

The amendment to the declaration also contains the following self-serving announcement made by ASCO and presumably "approved and consented to" by Realty Growth:

"The *Phase I unit owners* have either acquiesced in, or waived any objection to, the substitution of the twenty-eight (28) Phase II units for one hundred (100) of the additional units which the Declarant had originally intended and reserved the right, to construct on the common elements of the Condominium. The original three (3) building limitation has been superceded and nullified, with the *Phase I unit owners'* acquiescence or waiver, by the construction of the four (4) Phase II buildings." (Emphasis added.)

Not to be outdone in adding to the confusion, Realty Growth, in its so-called "Declaration of Acquiescence, Approval and Consent," has inserted language by which it attempts to make its consent to ASCO's amendment to the original declaration expressly conditional upon its legal right, as the owner of the remaining leasehold interest, to construct and develop up to 68 additional town house units on Phase III and Phase IV of the Pilot Point condominium project.

Upon being notified of the recording of the purported amendment, notice was given to Realty Growth on behalf of the Phase I owners and/or sublessees that the amendment was considered by them to be of no effect. Some three months after the recording of the amendatory documents the plaintiff, as the condominium council for Pilot Point constituted under and by virtue of the Unit Property Act, brought this action on behalf of the Phase I owners and/or sublessees seeking a declaratory judgment adjudicating the rights of the parties with respect to their interests in the Pilot Point condominium project. The plaintiff Council also seeks a permanent injunction against Realty Growth prohibiting it from further development or construction on the presently open and unused portion of the 17.35 acre tract.

Realty Growth counterclaimed for relief in its own right, and subsequently filed a second suit in which it named the individual Phase I owners/sublessees as defendants, the purpose being to have those individuals before the Court so as to facilitate discovery, among other things. The two actions were then consolidated and proceedings as to the later action stayed pending the motion for summary judgment made by the plaintiff Council on the complaint and counterclaim in the first action.

By way of recapitulation, then, the situation is as follows. Pilot Point has been submitted to the provisions of the Unit Property Act. A portion of it—Phase I—has been constructed, sold and leased pursuant to the recorded declaration and declaration plan. A second portion—Phase II—has been constructed, sold and leased in a manner which does not comply with the intention of the developer at the time the declaration was recorded, and which is in violation of the original declaration at least to the extent that the declaration was not amended so as to reflect a change in the percentage interests in the common elements as of the time Phase II was developed, sold and leased. Further, the developer specifically reserved in the declaration the right to construct not more than three additional buildings containing not more than 200 additional units in completing Phases II, III, and IV. Its successor in interest has already constructed four additional buildings containing 28 additional units. The successor in interest and its assignee of a portion of the 99-year lease have now purported to amend the declaration so as to permit the construction of still another twelve buildings containing anoth-

er 68 units. This attempt has been made without the consent of those who had previously acquired interests in Pilot Point by purchasing and/or subleasing the units comprising Phase I. However, the successor in interest to the original developer has purported to consent on behalf of those persons under the claim of a power of attorney allegedly created by the combination of the recording of the declaration by the original developer and the acceptance of subleases thereunder by the persons acquiring leasehold interests in Phase I. No attempt has been made to use the so-called power of attorney to furnish the consent of those in Phase II to the amendment, presumably because the Phase II owners and/or sublessees did not receive any interests under the original declaration and therefore the acceptance of subleases by those persons could not have activated the purported power of attorney contained in the declaration. As noted at the outset, the situation is rather a mess.

The position taken on behalf of the owners and/or sublessees in Phase I is simple enough. They say that they acquired their rights in Pilot Point on the understanding, as represented by the recorded declaration, that their initial proportionate interests in the common elements were subject to deletion by the construction of not more than three additional buildings on the remainder of the 17.35 acre tract containing not more than 200 additional units. They point out that actually four additional buildings have been constructed on the property. Thus, they argue that pursuant to the declaration their proportionate interests in the common elements are now fixed and are held proportionately with those units comprising Phase II. Secondly, they say that in any event the original declaration, both by its terms and pursuant to § 2205 of the Unit Property Act, cannot be amended so as to alter their interests in the common elements in the absence of their written consent. They have not given such consent and they dispute the contention that the declaration created any power of attorney in ASCO or anyone else to give consent on their behalf.

In analyzing this argument I conclude that we must start with the basic premise that under the original declaration no more than three additional buildings could be legally constructed on the property without the declaration being amended. The declaration says so in unequivocal terms by reserving to Anderson-Stokes the right to erect "not more than three additional buildings" and by defining the common elements to include all of the 17.35 acres not occupied by Phase I, subject to a decrease in cubic area by the right of Anderson-Stokes "to add three additional buildings." The declaration also reserved the right to Anderson-Stokes to establish the exact site of such additional buildings which it could construct "as set forth herein." Moreover, the initial interests of Phase I in the common elements could be altered and reduced "for the sole purpose" of adding not more than 200 additional units "as herein contemplated" and in the declaration the 200 units were limited to not more than three additional buildings. Finally, both ASCO and Realty Growth have conceded this point by the statement in the purported amendment that those in Phase I had waived the "original three (3) building limitation."

Thus, as I see it, the issue narrows itself to (a) whether the consent of those holding interests in Phase I was really necessary in order to amend the original declaration, and (b), if so, did ASCO have a power of attorney under the original declaration to give such consent on their behalf. Since a determination of the latter question would be dispositive even if the former warrants an affirmative answer, I deal with the two in reverse order.

The so-called power of attorney relied upon by Realty Growth is contained in the declaration. By its terms, the power of attorney supposedly came into being as of the time a person accepted a sublease to a town house unit in Phase I. From this it is to be noted that the claimed power of attorney does not come from a document signed by a sublessee specifically appointing another as his attorney in fact for a specific purpose. Rather, it allegedly springs from

the act of a person in signing a lease. Given the fact that by 25 *Del.C.* § 2204 a unit and its proportionate undivided interest in the common elements are for all purposes "real property," I conclude that a power of attorney cannot be created in this manner so as to authorize the conveyance and transfer of the real property interests of another.

■ In the first place, in accepted legal parlance, a power of attorney means an instrument in writing by which one person, as principal, appoints another as his agent, or attorney in fact, and confers upon him the authority to act in the place and stead of the principal for the purpose or purposes set forth in the instrument. *Kanawha Valley Bank v. Friend*, W.Va. Supr., 253 S.E.2d 528 (1979); *Estate of Rolater*, Okl.App., 542 P.2d 219 (1975); *Bank of America, Nat. Trust & Sav. Ass'n v. Horowytz*, N.J.Super., 104 N.J.Super. 35, 248 A.2d 446 (1968); *Arcweld Mfg. Co. v. Burney*, Wash.Supr., 12 Wash.2d 212, 121 P.2d 350 (1942); *Mullins v. Commonwealth*, Ky.App., 179 Ky. 71, 200 S.W. 9 (1918); 2 *Am.Jur.2d*, Agency § 23; 2A *C.J.S.* Agency § 150. Here we have no instrument in writing executed by any of the Phase I sublessees which purports to confer any specific authority on Anderson-Stokes or its successors to do anything in their stead. Rather, the power of attorney is contained in the instrument executed by the proposed attorney in fact rather than by the principal, and at best is incorporated by reference into a sublease document by the act of the sublessee in executing it. Realty Growth has offered no authority which would directly support the creation of a power of attorney in this manner, and I leave it at that.

■ Secondly, 25 *Del.C.* § 171 provides in its effect that a power of attorney to sell or dispose of interests in real estate must be acknowledged in the same manner as an acknowledgement required for a deed. In addition, 25 *Del.C.* § 172 indicates that a power of attorney to sell and dispose of lands must be acknowledged and recorded in order to empower the attorney in fact to acknowledge a deed disposing of such interests. Moreover, in order to be recorded, a power of attorney concerning lands or tenements must be acknowledged. 25 *Del.C.* § 154. The simple fact of the matter here is that under the two-step scheme relied upon by Realty Growth, none of the Phase I sublessees have given the necessary acknowledgement that is required by the statutes to empower one, as attorney in fact, to transfer real property interests of another.

It may be that the combination of the language in the declaration and the act of executing a sublease is sufficient to create some form of agency relationship between the sublessee and the condominium developer. But in my view any agency relationship created in this manner does not rise to the dignity required for a power of attorney to transfer the real property interests of another.

Accordingly, I hold that ASCO, as successor to Anderson-Stokes, had no power of attorney from those sublessees in Phase I which would have enabled ASCO unilaterally to file and record an amendment to the declaration for Pilot Point which would have diminished real estate interests held by such sublessees in the common elements in the condominium project.

This leads to the second and more disturbing aspect of the matter. Realty Growth now argues that those who were granted subleases in Phase I are actually not the "owners" of units in Phase I. Rather, Realty Growth contends that it is the "owner" of all 32 town house units and, as such, that it is the sole party needed to bring about an amendment to the declaration which would reduce the undivided proportionate interests of the Phase I units in the common elements in the condominium. Its reasoning runs as follows.

As noted previously, Realty Growth derived its interests from ASCO, and thus through Anderson-Stokes. Anderson-Stokes was the lessee under the 99-year lease from the City of Lewes. The five buildings containing the 32 town houses in Phase I were constructed by Anderson-Stokes, and thus were constructed on leased premises. From this Realty Growth argues that Anderson-Stokes was the owner of the

buildings, and that Realty Growth has now succeeded to such ownership interests in the buildings. Realty Growth bases this argument on the fact that there is nothing in the lease granted by the City of Lewes which gives the City the right to own any improvements constructed upon the premises upon the expiration of the lease. Rather, the lease gives the City of Lewes the right to reenter the premises and to "remove all persons and chattels" in the event of a default under the lease.

Realty Growth argues that in the absence of a showing to the contrary, the law implies that a landlord who gives his tenant permission to construct improvements on leased land also agrees thereby to recognize that such improvements are and will remain the tenant's property. *State v. Ancient Order of United Workmen*, Kans. Supr., 178 Kan. 69, 283 P.2d 461 (1955); *Connolly v. McLeod*, Miss. Supr., 212 Miss. 133, 52 So.2d 473 (1951); *Williamson v. Pye*, Tex.Ct.App., 18 S.W.2d 707 (1929); 41 *Am.Jur.2d*, Improvements § 3; 36 *C.J.S.* Fixtures § 4. Thus Realty Growth as assignee of the rights of Anderson-Stokes, as the constructing tenant, takes the position that as owner of the town house buildings it is necessarily the owner of all 32 town house units contained therein, subject only to the rights of those in Phase I to sublease the units for the balance of the 99-year term upon the payment of the annual ground rent.

■ There are several factors which make this line of reasoning unacceptable. In the first place, it has been observed by our courts that where one who is not the owner of the fee annexes a chattel to realty, the reasonable probability is that the improvement was placed there for his personal convenience and for the limited term of his estate, thereby negating an intention to make the improvement a permanent accession to the realty. Also, in such controversies between landlord and tenant the greatest latitude is allowed in favor of the tenant. But by the same token, it is the intention of the party making the annexation, as disclosed by the surrounding circumstances, that provides the controlling test. *Warrington v. Hignutt*, Del.Super., 31 A.2d 480 (1943).

■ Thus, such a determination is dependent on the facts and circumstances of each particular case. And while it would seem that one who erects a horizontal, two-story building containing as many as seven separate living units, complete with common walls, support structures, etc., cannot have realistically intended for the building to be removable at the end of a 99-year lease term, it is inappropriate for such a determination to be made in this proceeding for the simple reason that the landlord, the City of Lewes, is not a party. In other words, Realty Growth cannot base its position here on the premise that, as a matter of law, it is the owner rather than the lessee of the buildings even though it is only the lessee of the land.

More significantly, Realty Growth, as assignee of the interests and obligations of the original developer, is saddled with matters of record which do not support its theory. Specifically, the original declaration recorded by Anderson-Stokes makes repeated reference to "each unit owner" and "any unit owner." At one place it speaks to action by "a majority of the unit owners." At Paragraph 5 of the declaration voting rights are assigned to each of the 32 Phase I units, and by 25 *Del.C.* § 2217 only unit owners are entitled to exercise such voting rights. And at Paragraph 6, as previously set forth herein, the original undivided interest of any unit owner in the common elements can be altered only by an amendment to the declaration "duly executed by all unit owners affected." In addition, Paragraph 6 purports to create a power of attorney in favor of Anderson-Stokes or its successors from "all unit owners" in Phase I. None of these repeated references to unit owners would have been necessary had Anderson-Stokes, as the original developer and declarant, considered that under its condominium scheme it was retaining ownership of all Phase I units. Nor would it have been necessary for it to make provision to give a power of attorney to itself.

This leads to the matter of what those acquiring interests in Phase I purchased for the $47,500 to $52,500 contract price they were required to pay. Under Realty Growth's argument, they purchased nothing for that price but the right to sublease a town house based upon the continued payment of an annual ground rent. If this is true, then even though the property had been submitted to the provisions of the Unit Property Act, those in Phase I would have acquired no rights under the Act. They would have acquired no interests in the common elements, no voting right with regard to the maintenance and administration of the condominium, no right to act through the condominium council as provided by statute and the code of regulations incorporated in the declaration, etc. Rather, under Realty Growth's argument, all of these rights and powers would be vested in Realty Growth by virtue of it being the sole "unit owner" of all 32 town house units. Those purchasing interests in Phase I would be sublessees of the sole unit owner, and nothing more.

This cannot be. If so intended, it seems to me to border upon fraud. It would mean that the lessee-developer had created a condominium under the Unit Property Act in which it was actually selling nothing and in which it was retaining all facets of control even though nothing is contained in the recorded declaration to evidence such an intention and purpose.

■ It seems that the public interest should require a unit property developer with such intentions to clearly state them of record in order that those considering the acquisition of a property interest in a potential condominium regime may know in advance that the entire scheme, architectural design and density of the project may be changed at any time without their consent. The failure to make this clear should be construed against the party who places the documents of record and those who succeed to his interests. Where the legislative act permits the interests of the purchasing public to depend upon the unbridled ingenuity of those hustling for a dollar in a real estate boom economy, it seems only appropriate that any doubt in the language of the recorded declaration be resolved against the party who possessed the unfettered power to create the situation under the authority of the statute, and in favor of those who make their acquisition in reliance on the recorded documents. Under the Delaware Unit Property Act, I so hold.

■ I further hold on the undisputed facts of the matter that those persons who acquired their interests by means of a cash payment of $47,500 to $52,500 and the execution of a sublease for the number of years at the time remaining on the 99-year lease from the City of Lewes are "unit owners" within the contemplation of the original declaration recorded by Anderson-Stokes, and that as such no valid amendment can be made to that original declaration without their written consent as required by 25 Del.C. § 2219(6) and 25 Del.C. § 2205.

In passing I note that the complexity of this matter is in large part attributable to the fact that the Delaware Unit Property Act is virtually silent with regard to interests that may be created when leased land is submitted to the provisions of the Act. By § 2240 and § 2203 of the Act it is made clear that leased land may be submitted to condominium status. The definitions of the terms "declaration" and "property" contained in § 2202 of the Act also make reference to leased property, and § 2205 provides that the undivided interests in the common elements may not be separated from a unit which is conveyed, leased or encumbered. Aside from this, however, the Act pays no particular attention to any rights to which a sublessee of leased condominium property may be entitled. Rather the Act deals with the requirements for deeds to condominium units and the rights and duties of unit owners. There is no definition of a "unit lessee" contained in the Act. It is almost as though the few references to leased property were thrown in as an afterthought. The result, as evidenced here, is predictable. Some well thought out and clarifying action by the General Assembly would seem desirable. Otherwise, in years to come when all

of the potential splitting of property interests that can be created under the present Act start to come home to roost, it may well require the creation of a separate court in our judicial system just to untangle them.

As to the remaining issues argued by the parties—and there are several—I have read and considered them, but I find that they do not alter the result reached herein. I simply make note of them as follows.

■ Realty Growth argues that by standing by and permitting four buildings to be constructed in Phase II the Phase I owners waived any right to rely on the three building limitation contained in the declaration. Realty Growth also asserts the defenses of laches, acquiescence, ratification, estoppel, unclean hands, and relative convenience. But while those in Phase I may have waived any right to complain about the construction of the fourth building in Phase II, this cannot mean that they have waived their right to object to additional violations of the declaration. As to the other defenses, I find them to be without merit on the facts. Particularly significant is Realty Growth's concession that in acquiring its interests in Pilot Point from ASCO it relied on the opinions of ASCO's attorney, ASCO's architect and ASCO's engineer, and that it was unaware of the three building limitation contained in the recorded declaration at the time. Under the circumstances, I fail to see how it can claim that it was "permissibly ignorant" of information clearly contained in the recorded declaration required by law.

Realty Growth also argues that those acquiring interests in Phase I paid no consideration for the three building limitation placed in the declaration and that consequently they have no standing to enforce it. It further argues that it would be inequitable and a form of unjust enrichment to permit those in Phase I and Phase II to now enjoy the remaining unused land in the 17.35 acre tract as part of the common elements since they did not bargain for such an open area and since it was not contemplated at the time that they acquired their interests.

As to the first point, Realty Growth points out that all contracts were signed as to Phase I before Anderson-Stokes actually submitted the property to the provisions of the Unit Property Act. Thus, it argues that at the time none of those acquiring interests in Phase I had a contractual right to limit the number of additional buildings in any way. Since Anderson-Stokes later recorded the declaration and created the limitation without demanding anything in addition from those under contract for the Phase I town houses, Realty Growth argues that there was no consideration given by them which would bind the developer, or its assigns, to live up to that commitment.

■ Of course, this argument would apply to any other rights that would have flowed to those in Phase I as a result of the property being submitted to condominium status under the Act. And therein lies the answer. It is the statute itself which creates the rights, not the contractual arrangement between the parties prior to the submission. Property does not have to be submitted under the statute. But if it is, then the Unit Property Act establishes the rights and interests that govern the property so submitted. One provision is that those who obtain rights in condominium units cannot have their proportionate interests in the common elements changed without their consent. In short, this argument of Realty Growth tends to ignore the fact that the statute exists and that the property was placed under it by the developer.

■ The same holds true for the unjust enrichment argument. No one required Anderson-Stokes to impose the three building, 200 unit limitation when it recorded its declaration. Presumably it did so for its own purposes. Likewise, no one required ASCO to deviate from the original plan and to use up the three building limitation as it saw fit just as though those already in Phase I did not exist. As the developers, they had the right to structure the declaration and declaration plan as they saw fit, and they had the power to properly seek a deviation from it before the situation that

has caused the problem was created. If the result is to convey an unexpected benefit on those in Phase I and Phase II, it has been caused by those possessing the power to have avoided it. To adopt Realty Growth's position would scarcely be equitable to those in Phase I and Phase II. They had no reason to believe at the time of their acquisition that the remaining area in the tract would eventually be ringed and packed to the limit with additional buildings and town houses.

Moreover, since counsel have freely disclosed it in their arguments and since we are discussing equitable conduct, I think it proper to note that those in Phase I and Phase II have indicated a willingness to voluntarily agree to the construction of additional town house units approaching 40 in number. It is Realty Growth that is holding out in an effort to use all of the remaining land so as to construct the additional 68 units. Again, it seems to me that as between the two factions the one who must suffer the loss is the party who stands in the shoes of those who created the situation—in this case Realty Growth—even if it does result in an unanticipated benefit for those on the other side.

As to the contentions made in Realty Growth's counterclaim, certain of them have been disposed of by the decision reached herein. As to another, Realty Growth has offered no argument or authorities. In any event, I find its counterclaim contentions to be without merit.

Accordingly, on the facts of record and the pleadings I conclude that the plaintiff is entitled to summary judgment and its motion will be granted. However, one final point deserves mention.

The complaint and counterclaim overall seek a determination of the rights of the Phase I owners and/or sublessees as contrasted with those of Realty Growth. This cannot be accomplished without consideration of the status of those in Phase II. Realty Growth has apparently proceeded so

far on the premise that Phase II is not within the condominium unless the amendment recorded by ASCO and the conditional consent of Realty Growth are honored. From a common sense approach I cannot accept this premise. It derives from the belief that structures can exist on the unit property land which are not part of the unit property. Perhaps, with someone's unbridled imagination and ingenuity, this may be possible. But not here.

In this situation, the entire 17.35 acre tract was submitted to the provisions of the Act. When the 28 Phase I town houses were subsequently constructed on a portion of the tract, they of necessity had to become unit property subject to the provisions of the Act. The only thing that is lacking is that the declaration has not been properly amended for record so as to reflect the proportionate undivided interest of those 28 units in the common elements.

Such an amendment requires action by Realty Growth as well as the individual owners and/or sublessees in Phase I. All such parties are before the Court in these consolidated actions as I understand it. Therefore, the order to be entered hereon, in addition to including the conclusions reached herein, shall also include a directive that the necessary documents be executed by all such parties so as to enable the required amendment to be recorded and the various rights of record in the common elements properly apportioned between the Phase I and Phase II units so as to properly reflect their true interests. Some day this mess simply must be rectified once and for all.

I direct counsel for the plaintiff to submit a form of order, on notice.