# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CONCERNED CITIZENS OF THE ESTATES OF FAIRWAY VILLAGE, JULIUS H. SOLOMON, PEGGY A. SOLOMON, EDWARD D. LEARY, LISA P. TORRINI LEARY, KENNETH P. SMITH, DENISE M. SMITH, TERRY L. THORNES AND CARMELA M. THORNES | : : : : : : : : : : : | |
| and | : : | |
| 36 BUILDERS, INC., d/b/a INSIGHT HOMES, | : : : | |
| Plaintiffs, | : : | |
| v. | : : : | **C.A. No. 2017-0924-JRS** |
| FAIRWAY CAP, LLC and FAIRWAY VILLAGE CONSTRUCTION INC., | : : : | |
| Defendants. | : : | |

## MEMORANDUM OPINION

Date Submitted: January 3, 2019
Date Decided: March 6, 2019

Richard E. Berl, Jr., Esquire of Hudson, Jones, Jaywork & Fisher, LLC, Lewes, Delaware, Attorney for Plaintiffs Concerned Citizens of the Estates of Fairway Village, Julius H. Solomon, Peggy A. Solomon, Edward D. Leary, Lisa P. Torrini Leary, Kenneth P. Smith, Denise M. Smith, Terry L. Thornes and Carmella M. Thornes.

Jeffrey M. Weiner, Esquire of Law Offices of Jeffrey M. Weiner, P.A., Wilmington, Delaware and Timothy Jay Houseal, Esquire and William E. Gamgort, Esquire of Young, Conaway, Stargatt & Taylor LLP, Wilmington, Delaware, Attorneys for Defendants Fairway Cap, LLC and Fairway Village Construction Inc.

**SLIGHTS, Vice Chancellor**

Homeowners within a Residential Planned Community in Ocean View, Delaware, known as Fairway Village, initiated this action to obtain permanent injunctive relief against the current developer that would: (a) prevent the developer from constructing townhouses in the community for use as rental apartments; and (b) require the developer to build townhouses for sale that conform to townhouses already constructed in the community. According to the homeowners, the developer's plan to create an apartment regime at Fairway Village threatens the value of their properties and undermines the internal governance scheme for the community as designed by the original developer. In response, the developer maintains that the harm identified by the homeowners is illusory and, even if it exists, there is no legal basis to prevent the developer from putting its property to the property's best use.

At first glance, the homeowners make a compelling case. They bought into a Residential Planned Community believing the community would be comprised of like-minded residential homeowners who were invested, both financially and emotionally, in the community they were creating. The developer's plan to place a rental complex within this community will place transient residents with different incentives alongside homeowners who presumably take pride in home ownership and in sustaining a residential neighborhood. Their frustration at this prospect is understandable.

1

But the developer has the better legal position. The documents governing the development of this Residential Planned Community neither expressly nor implicitly prohibit the developer from doing precisely what it plans to do. Nor will the planned rental regime violate any State statute or local ordinance. While the homeowners resist this reality with tortured readings of the governing community documents, their principal argument is that the Court should either imply restrictive covenants in these documents or invoke its equitable powers to prevent an injustice.[1] The implied covenant does not work here, however, both because it has not been pled and because the community's governing documents address the matter directly. And, while equity "will not suffer a wrong without a remedy," the homeowners stretch this maxim beyond its limits by assuming that equity may be invoked to prevent a party from lawfully exercising its contractual rights or a property owner from putting its property to a lawful use, even when such conduct may be harmful to others in the community. The homeowners were given an opportunity to prove a wrong that might be redressed by equity during a one-day trial. As explained below, they failed to do so. Consequently, judgment must be entered for the Defendants.

---

[1] *See* Pls.' Answering Post-Trial Br. 23.

## I. FACTUAL BACKGROUND

I have drawn the facts from the parties' pre-trial stipulation, evidence admitted at trial and those matters of which the Court may take judicial notice.[2] The trial record consists of 114 joint trial exhibits, 296 pages of trial testimony and 14 lodged depositions. The following facts were proven by a preponderance of the competent evidence.

### A. Parties and Relevant Non-Parties

Plaintiff, Concerned Citizens of The Estates of Fairway Village ("Concerned Citizens"), is an unincorporated association of individuals with varying ownership interests in real property within Fairway Village, a Residential Planned Community located in Ocean View, Sussex County, Delaware.[3] In addition to Concerned Citizens, several members of the association who own property in Fairway Village have joined as named plaintiffs in this action. Julius H. Solomon and Peggy A. Solomon own a single-family dwelling at 59 Golden Eagle Drive.[4] Edward D. Leary and Lisa P. Torrini Leary, who reside in Florida, own a single-family dwelling at

---

[2] I cite to the Verified Complaint as "Compl. ¶"; the Joint Pre-Trial Stipulation and Order as "PTO ¶"; the joint trial exhibits as "JX #"; and the trial transcript as "Tr. # (witness name)."

[3] Compl. ¶ 1.

[4] Compl. ¶ 2.

3 Golden Eagle Drive, which they maintain as a second home.[5] Kenneth P. Smith and Denise M. Smith own a townhouse condominium (Unit 47) at 123 Oakmont Drive.[6] And Terry L. Thornes and Carmela M. Thornes own the townhouse condominium (Unit 4) at 107 Oakmont Drive.[7]

Defendant, Fairway Cap, LLC, is a Delaware limited liability company located at 105 Foulk Road, Wilmington, Delaware 19803.[8] Fairway Cap owns several lots in Fairway Village where it proposes to develop a townhouse rental regime. Indeed, it has already caused several townhouses to be constructed and rented.[9] Defendant, Fairway Village Construction, Inc., a Delaware corporation located at 105 Foulk Road, 2nd Floor, Wilmington, Delaware 19803, constructs townhome condominiums in Fairway Village on lots owned by Fairway Cap.[10]

---

[5] Compl. ¶ 3; Tr. 106, 135 (Torrini Leary).

[6] Compl. ¶ 4.

[7] Compl. ¶ 5.

[8] Compl. ¶ 6.

[9] Compl. ¶ 12, 16. The Court issued a preliminary injunction preventing Fairway Cap from renting any further townhouses during the pendency of this litigation. D.I. 31.

[10] Compl. ¶ 7. Fairway Cap and Fairway Construction collectively are referred to as "Defendants." *Id.*

## B. The Development of Fairway Village

In 2006, Caldera Properties, the first developer of Fairway Village, recorded a Record Plan for a Residential Planned Community for the Estates of Fairway Village, a community comprising over 121 acres and upon which 166 single-family home lots and 166 townhouse condominium units would be developed.[11]  The Town of Ocean View, Delaware (the "Town" or "Ocean View") approved the plan and it was recorded at the Sussex County Office of the Recorder of Deeds in Plot Book 110, Page 107.[12]

Dan McGreevy is Caldera's principal.  He acquired the property that would become Fairway Village from the Skiba and Chandler families.[13]  After marshaling Fairway Village's plans through recordation, McGreevy assigned his contractual rights to the Estates of Fairway Village, LLC ("Estates") and its principals—Mario Capano, Frank Capano and Tony DiEgilio—represented by attorney Samuel J. Frabizzio, Esquire.[14]

---

[11] Compl. ¶ 10.

[12] PTO ¶ 1.  *See* JX 2.

[13] Tr. 181 (Frabizzio).

[14] Tr. 182 (Frabizzio).

NVR, Inc., trading as Ryan Homes ("NVR" or "Ryan"), agreed to acquire several lots and build homes and townhouses at Fairway Village.[15] Estates asked NVR to take the lead in drafting the governing documents for the community. NVR agreed. Its attorney, Edward Tarlov, Esquire, prepared the documents with input from Frabizzio.[16]

Fairway Cap first sought to be involved at Fairway Village as a developer of certain designated lots.[17] When Estates defaulted on its loan to TD Bank, however, Fairway Cap acquired the delinquent loan and thereby acquired all remaining building lots by deed in lieu of foreclosure without having to pay transfer tax.[18] Fairway Cap thus bound itself as successor in interest to all of the community's governing documents of record.[19]

---

[15] Tr. 6 (Tarlov). NVR's counsel referred to the arrangement as a "building permit agreement" which was necessary because NVR's charter does not permit it to serve as a property developer. Tr. 10 (Tarlov).

[16] Tr. 7 (Tarlov); Tr. 187 (Frabizzio).

[17] JX 58.

[18] JX 6; 30 *Del. C.* § 5401(1)(p).

[19] JX 39 at 13.

## C. Troubled Sales

NVR built and sold six townhouse condominium units in Fairway Village over two years.[20] In 2010, however, after determining it could not sell additional condominium units in Fairway Village at a profit, NVR decided to cut its losses, pay contractual penalties and terminate its agreements with Estates.[21]

NVR was not alone in experiencing difficulty selling townhouse condominiums in Fairway Village. In June 2015, 36 Builders, Inc., trading as Insight Homes ("Insight"), bought twenty condominium sites in Fairway Village for $1.45 million.[22] Of its twenty townhouse condominium lots, Insight built and sold twelve units before sales stalled.[23] Frabizzio twice sent Notices of Default to Insight because it did not meet the take down schedule for additional units as agreed upon with Fairway Cap.[24] Insight responded by assuring Fairway Cap that it was doing its best to make sales; the market was just not there.[25]

---

[20] *Id.*; PTO ¶ 14.

[21] Tr. 183–84 (Frabizzio). NVR forfeited $700,000 in liquidated damages. *Id.*

[22] JX 33 ¶ 7.

[23] JX 61.

[24] Tr. 201 (Frabizzio).

[25] Tr. 252–53 (Frabizzio).

For its part, to stoke sales activity, Fairway Cap constructed a model and a number of spec townhouse units.[26] It also hired a sales team, including an on-site Fairway Village representative,[27] and advertised the townhouse units in multiple outlets.[28] Even so, it took almost two years before Fairway Cap sold its first four units. Over the following year, sales continued at a remarkably slow pace.[29] TD Bank was demanding repayment of its loan.[30] Something had to give.

In the winter of 2016, with no sign of improving sales, Fairway Cap hired the Real Property Research Group ("RPRG") to conduct a "Preliminary Market Assessment."[31] The study concluded the most economically sustainable option for Fairway Cap's townhouse condominium lots was to build townhouse condominiums on the lots, maintain ownership and rent out the units to long-term residential occupants.[32] After considering its options, Fairway Cap determined that RPRG had

---

[26] Tr. 250 (Capano).

[27] *Id*.

[28] *Id.*

[29] JX 74.

[30] JX 39, Ex. 7.

[31] *Id*.

[32] *Id.*, Ex. 6 at 51.

8

presented the best course and decided to pursue the rental regime at Fairway Village.[33]

In November 2017, M&T Bank loaned $18.2 million to Fairway Cap to fund construction of the rental units. Fairway Cap's mortgage characterized the project as a commercial enterprise.[34] The "term sheet" described the rental units as "apartments."[35] And Section 1.5 of the Construction Loan Agreement refers to the construction of thirty-four "apartment buildings."[36] A Management Agreement, dated June of 2017, provided that Capano Management, a company that manages commercial assets for Louis Capano, III and his father, Louis Capano, Jr., would manage 127 rental units at Fairway Village.[37]

## D. Concerned Citizens Object

Plaintiffs discovered Fairway Cap's plan to build townhouses for rent after seeing an online advertisement for apartments to be known as "The Reserve at

---

[33] Tr. 253:2–254:14 (Capano); JX 39 at 17.

[34] JX 26, Mortgage at 2 ("The Obligations secured by the Mortgage were obtained solely for the purpose of carrying on or acquiring a business or commercial investment and not for residential, consumer or household purposes.").

[35] JX 26, June 1, 2012 Term Sheet, at 2 ("To provide acquisition and construction financing for the Fairway Village Apartment Project . . .").

[36] JX 26.

[37] JX 39 at 7; JX 27.

Fairway Village."[38]   Several homeowners appeared at a September 2017 Ocean

View Town Council meeting to voice their objections.[39]   The Town Council heard

the objections and took the matter under advisement.   After performing some

research, the Town Council advised the homeowners that it could not provide relief

since the planned rentals appeared to comply with Fairway Cap's recorded plans and

with the Town's Code.[40]   In response to this notification, on September 18, 2017,

Plaintiff, Harold Solomon, wrote a letter to the Mayor of Ocean View in which he

restated the homeowners' objection to Fairway Cap's rental plans.[41]   On October 3,

2017, the Mayor responded by restating the Town's position:

> The fact that the developer has chosen to remain the owner of multiple townhouses, rather than sell them, doesn't change the law, the Code or the rights of individual homeowners.  It simply makes the developer an owner of multiple housing units, subject to the same rules and regulations as anyone else under the Town Codes . . .[42]

On October 4, 2017, Plaintiff, Lisa Leary, apprised the Town by email that

the "rental units being constructed are substantially smaller than the smallest

townhome units in [Fairway Village], which seems to indicate that there has been a

---

[38] JX 19.  The homeowners also discovered online ads soliciting applications for an on-site rental manager.  JX 20.

[39] JX 11.

[40] *Id*.

[41] JX 103.

[42] *Id*.

significant footprint change in the Subdivision Plans."[43]  The Town's Director of Public Works replied, "[t]he changing of a model does not constitute a change in the Site. . . .  The developer is limited to the number of units that can be constructed. . . . [T]he permits issued for the [townhouses] in Fairway Village all exceed the minimum livable floor area of 1250 square feet required by Code."[44]

On October 5, 2017, Ms. Leary emailed the Town to advise that "the building footprint [for the to-be-rented townhouses had] overlapped the lot lines."[45]  The Director of Public Works responded, "[w]ith the exception of [townhouse] Units 160 through 166, which have been constructed on their own individual lot, the area where the remaining 159 [townhouses] are being constructed is also one individual lot but larger.  There are no individual lot lines for the Townhouses."[46]

On October 20, 2017, Ms. Leary emailed the Town again, this time to inquire whether copies of Fairway Village townhouse leases were required to be filed with

---

[43] JX 104.

[44] *Id*.

[45] JX 105.

[46] *Id.*

the Town.[47]  On October 27, 2017, the Director of Public Works emailed back, explaining that rental leases are not filed nor required to be filed with the Town.[48]

Ms. Leary's final written correspondence with the Town occurred on November 1, 2017, when she reiterated her concern that Fairway Cap's construction of the rental townhouses did not comply with the Town Code.  The Town Manager responded by letter dated November 6, 2017, in which he confirmed that the Town did not see any violations of the Town Code in connection with Fairway Cap's construction activities, nor did the Town see any need for Fairway Cap to file a "re-subdivision" plan with the Town.[49]

## E. The Rental Scheme's Impact on Existing and Potential Homeowners

Fairway Cap's current plan is to retain ownership of more than 76% of the condominium units to be built in Fairway Village.  This high concentration of ownership renders Fairway Village a "non-conforming" community for purposes of securing mortgage financing that can be insured by the Federal National Mortgage Association ("Fannie Mae") or Federal Home Loan Mortgage Corporation

---

[47] JX 108.

[48] *Id.*

[49] JX 109; JX 110.

("Freddie Mac").[50] According to Plaintiffs' mortgage financing expert, Joseph Della Torre, the lack of access to Fannie Mae or Freddie Mac-backed mortgages makes condominiums in Fairway Village "unwarrantable,"[51] meaning prospective purchasers or unit owners seeking to refinance will pay higher interest rates and higher points with lenders who offer products not insured by Fannie Mae or Freddie Mac.[52]

Leland Trice, Plaintiff's real estate valuation expert, opined that property values throughout Fairway Village (both for single-family homes and townhouse condominiums) would suffer if Fairway Cap were permitted to introduce its townhouse rental regime into the community.[53]  His rationale is simple. A community comprised largely of transient residents is less attractive, and therefore less valuable, than a community comprised of homeowners.  For his part, Della Torre opined that the higher mortgage payments (caused by the lack of access to Fannie

---

[50] *See* JX 41 (explaining the prominent role that both Fannie Mae and Freddie Mac play in providing residential mortgages).

[51] JX 25.

[52] *Id.* Leland Trice of Valucentric (Plaintiffs' real estate expert), Beth Umstead (Fairway Village's property manager), and Anne Vogel Flaherty (Defendants' mortgage consultant) all agreed that access to Fannie Mae and Freddie Mac mortgages would be problematic for Fairway Village condominium owners given the concentration of ownership in a single owner (Fairway Cap).  JX 21 at 5; JX 36 at 63–64; Tr. 282 (Flaherty).

[53] JX 21 at 12.

Mae and Freddie Mac mortgages) would shrink the pool of potential buyers, also lowering property values.[54]

Fairway Cap's rental scheme will also affect Fairway Village's governance and management structure. Under Section 5.7 of the Constitution, the Developer is exempt from assessments.[55] Consequently, Fairway Cap will not be subject to current or future assessments for the approximately 127 condominiums it plans to build, own and rent. Section 5.9 of the Constitution, as amended, requires a $900 contribution from the initial purchaser of each living unit in Fairway Village.[56] Fairway Cap's rental units will not yield these up-front payments. Additionally, Section 5.10 requires the community association to create certain reserve funds for the repair and replacement of community areas and community property.[57] This requirement has not been satisfied by the Fairway Cap-controlled association.[58] All told, Fairway Cap's retention of 127 units deprives the community association

---

[54] JX 25.

[55] JX 5.

[56] *Id.*

[57] *Id.*

[58] Todd Moyer, Fairway Cap's "Development Coordinator," and Capano testified, contrary to the governing documents, that Fairway Cap has the right to utilize those funds to make up for cash shortfalls in operations, even when it is the party responsible for those shortfalls. *See* JX 38 (Moyer Dep.) at 15; JX 39 (Capano Dep.) at 58. It appears that Fairway Cap failed properly to fund the required replacement escrows for the Homeowners Association. JX 36 at 38.

of approximately $114,000 in operating revenues that would be generated if these units were sold to the public.

Although it incorporated in 2008, the Condominium Association did not hold its first annual meeting until the fall of 2017.[59] And contrary to the requirements of the enabling documents, two owner representatives have never been elected to the Condominium Council.[60] Moreover, according to Section 4.3 of the Community Constitution,[61] as long as Fairway Cap owns units in Fairway Village, its "Class B" membership gives it the right to additional votes until 2023.[62] With this provision

---

[59] JX 36 at 30; JX 38 at 30.

[60] JX 38 at 30.

[61] The Community Constitution sets the framework upon which all of Fairway Village, both single-family lots and condominium units, will be governed. PTO ¶ 4. Specifically, the Community Constitution calls for the creation of the "Estates of Fairway Village Community Association, Inc." (the "Community Association"), a Delaware non-stock corporation comprised of all owners in Fairway Village. *Id.* ¶ 5. The 166-unit condominium was formally established by the Declaration. *Id.* ¶ 6. A separate Code of Regulations was recorded, as well as a Declaration Plan, in compliance with the Delaware Unit Property Act. *Id.* ¶ 7. Though a separate legal entity by the Declaration, the condominium also operates under the umbrella Community Association created by the Constitution, which the Declaration referred to as the "Master Association." *Id.* ¶ 8.

[62] JX 5 § 4.3. The provision states:

> The Class B Members shall be the Community Founder, its nominee or nominees, and shall include every person, group of persons, corporation, partnership, trust or other legal entity, or any combination thereof, who shall obtain any Class B membership by specific assignment in writing from the Community Founder. The Class B Members shall be entitled to one (1) vote for each Class B membership. Class B shall be increased by three (3) memberships for each Living Unit in excess of six hundred (600) Living Units which is annexed within the jurisdiction of the Association in

15

in hand, Fairway Cap controls approximately 1,100 votes (compared to about 200 homeowner votes).[63] Plaintiffs maintain Fairway Cap has thus "entrenched itself at Fairway Village" by establishing "control over the condominium, and any conflict between its own business plan and the best interests of the condominium will be decided by Fairway Cap."[64]

---

accordance with Article 2 of this Community Constitution. Class B shall be decreased by three (3) memberships for each Living Unit conveyed to a Class A Member, excluding any Living Unit conveyed to a Participating Builder; the Community Founder shall retain the Class B Membership and voting rights of any portion of the Property owned by Participating Builders. Each Class B membership shall lapse and become a nullity on the first to happen of the following events: (i) Thirty (30) Days following the date on which the total authorized, issued and outstanding votes of the Class A Members equals two hundred forty nine (249); or (ii) The later of (1) fifteen (15) years after the recordation of this Community Constitution or (2) five (5) years after the last filing of a Declaration of Annexation; provided, however, that if the Community Founder is delayed in the improvement and development of the Property on account of a server, water or building permit moratorium or any other cause or event beyond the Community Founder's control, then the aforesaid period shall be extended by a period of time equal to the length of the delays or an additional five (5) years, whichever is less; or (iii) Upon the surrender of the Class B memberships by the then holders thereof for cancellation on the books of the Association. Upon the lapse or surrender of any of the Class B memberships as provided in this Article, the Community Founder shall thereafter remain a Class A Member of the Association as to each and every Living Unit from time to time subject to the terms and provisions of this Community Constitution in which the Community Founder then holds the interest otherwise requited for Class A membership.

[63] *Id.*

[64] Pls.' Opening Post-Trial Br. 10.

## F. Relevant Provisions of the Community's Governing Documents

The definition section within the Fairway Village Declaration Establishing a Plan for Condominium Ownership (the "Declaration") applies both to the Declaration itself and to the "Code of Regulations recorded immediately hereafter and all amendments to said documents."[65] The Declaration defines "Unit Owner" as "any natural person, corporation, partnership, association, trust or other legal entity . . . which owns title to a Unit."[66] "Buildings" are defined as the "buildings used or intended to be used for residential purposes (including leasing of Units for residential purposes) or for any other lawful purpose more specifically set forth in the Declaration . . . and shall expressly include the Initial Buildings and, when and if constructed and submitted to the Act, any Expansion Building(s)."[67]

The Declaration further states that each Unit and the Common Elements "shall be occupied and used as follows":

> No part of the Property shall be used for other than residential housing and the related common purposes for which the Property was designated. Each Unit shall be used only for residential purposes and shall be occupied only by as many persons as do not burden the Unit or Common Elements; provided, however, that Developer shall be entitled to use a Unit or Units as 'models' or 'samples' for the purpose of selling or renting Units in the Condominium;

---

[65] JX 3 § 2.

[66] JX 3 § 2(gg).

[67] JX 5 at 1.

Except for residential use permitted by paragraph (a) of this Section, no industry, business, trade, occupation or otherwise designed for profit, altruism, exploration or otherwise shall be conducted, maintained or permitted on any part of the Property, nor shall be conducted, maintained or permitted on any part of the Property. Except for the Developer, its successors and assigns, and the agents thereof, no 'For Sale' or 'For Rent' signs or other window displays or advertising shall be maintained or permitted on any part of the Property or in any Unit therein without the prior written consent of the Council. The right is reserved by the Developer or its agents to place 'For Sale' or 'For Rent' signs on any unsold or unoccupied Units or at suitable places in the Common Elements.[68]

The Community Constitution provides that "[a]ny owner who leases his/her Living Unit shall be deemed to have assigned his/her right to utilize the Community Property to the lessee of the Living Unit."[69] Anticipating that individuals other than owners may reside in the condominium units, the Community Constitution also provides:

Every provision of the Governing Documents, including the Community Codes, shall apply to all Owners, tenants, occupants, guests and invitees of any Living Unit. All owners who lease their Living Units shall include a notice provision in the lease informing the tenant and all occupants that the Living Unit and Community Property are subject to the Governing Documents, including the Community Codes. However, the failure to include such provision in the Lease shall not relieve any person of responsibility for complying with the Governing Documents.[70]

---

[68] JX 3 § 9(a), (f).

[69] JX 5 § 3.1.

[70] *Id.* at § 10.1.

The Community Constitution makes clear that "no Community Code shall prohibit outright the leasing or transfer of any Living Unit, or require consent of the Association for transfer of any Living Unit."[71]

The Code of Regulations for Estates of Fairway Village Condominiums (the "Code") states, in relevant part:

> The Developer or the Association may from time to time adopt rules and regulations pertaining to the rental of Units. Owners of rented Units shall be personally liable for the failure of a tenant or any invitee of a tenant to abide by rules and regulations pertaining to the use or occupancy of the Development. The Owners of any units shall obtain the approval of the Developer or the Association for any lease forms for the leasing of units within [Estates of Fairway Village Condominium].[72]

In a section devoted entirely to "Sales, Leases, and Alienation of Units," the Code states:

> No Owner shall execute any deed, *lease*, mortgage or other instrument conveying or mortgaging the title to his Unit without including therein the undivided interest of such Unit in the Common Elements, it being the intention hereof to prevent any severance of such combined Ownership and Interest. Any such *lease*, mortgage, or other instrument purporting to affect one or more of such interests, without including all such interests, shall be deemed and taken to include the interest or interest so omitted, even though the latter shall not be expressly mentioned or described therein. No part of the interests in the Common Elements of any Unit may be sold, *leased*, transferred, given, devised, or otherwise disposed of, *except as part of a* sale, *lease*, transfer, gift, devise, *or other disposition of the Unit* to which such interest are

---

[71] *Id.* at § 10.4.

[72] JX 7 § 5.16.

appurtenant, or as part of a sale, *lease*, transfer, gift, devise or other disposition of such part of the interest in the Common Elements of all Units.[73]

The only express restriction on an owner's right to rent his condominium unit appears in Section 9.2 of the Code, which states, "no Owner shall be permitted to convey, mortgage, hypothecate, sell, lease, give or devise his Unit unless and until he . . . shall have paid in full to the Council all unpaid Common Expenses . . . against his Unit and payable prior to the date of conveyance, except permitted mortgagees."[74] The Code also emphasizes that no amendment to the Code may "interfere with or affect . . . the lease, sale, other disposition or use of any Unit(s) owned by Developer."[75]

The Code contemplates that copies of lease agreements will be supplied to the Condominium Council:

> "[e]very Unit Owner, within ten (10) days of entering into a lease or any other agreement for the occupancy or use of his Unit (including, but not limited to, any rental agreement that may be excluded under the Delaware Landlord Tenant Code under 25 Del. C. § 5102), shall supply a copy of any such lease or other agreement to the Council together the payment of a reasonable administrative fee to process such registration of each lease or other agreement as may be determined by the Council. Any such rental agreement shall also expressly provide that such rental agreement is subject to the provisions of the Act, the Declaration, this Code of Regulations and the Rules and Regulations and that any failure

---

[73] JX 7 § 9.1 (emphasis supplied).

[74] JX 7 § 9.2.

[75] JX 7 § 13.2.

of the lessee to comply with such provisions shall constitute a default under the rental agreement.[76]

Finally, the terms and conditions of Fairway Cap's form Agreement of Sale and Purchase for Fairway Village townhome condominiums clearly alerts buyers that Fairway Cap reserves the right to rent unsold units: "Buyer further understands and agrees that Seller shall own, may vote in connection with, may further improve, and may rent any unsold unit, and in connection therewith shall have no lesser rights, privileges and powers than any other unit owner."[77]

## G. Procedural History

Plaintiffs filed their three-count Verified Complaint on December 28, 2017.[78] Count I alleges breach of contract[79]; Count II alleges breach of fiduciary duties; and Count III alleges fraud.[80] On January 25, 2018, Plaintiffs sought an order enjoining Defendants from constructing units with dimensions that deviate either from recorded plans or from units already constructed, particularly regarding square footage. The proposed order included a mandatory component that would compel

---

[76] JX 7 § 9.3.

[77] JX 102 § 22. *See also* Tr. at 145 (Torrini Leary).

[78] Compl.

[79] It is important to note here that Plaintiffs did not plead a claim for breach of the implied covenant of good faith and fair dealing in their complaint, nor did they identify the implied covenant as an issue to be tried in the Pre-Trial Stipulation and Order.

[80] Compl. ¶¶ 51–78.

21

Defendants to rebuild or reconfigure noncompliant units.[81] Plaintiffs also sought an order enjoining Defendants from maintaining a residential apartment complex in Fairway Village, requiring Defendants to place all constructed townhouse condominium units up for sale to the public and requiring the immediate transfer of control of the governance at Fairway Village to the owners of existing homes and condominiums.[82]

The Court granted Plaintiffs' Motion for Preliminary Injunction in part on March 20, 2018, by enjoining Defendants from renting townhouse condominium units at Fairway Village pending trial. Thereafter, on April 19, 2018, the Court granted Defendants' motion to dismiss Plaintiffs' breach of fiduciary duty and fraud claims, leaving only the breach of contract claim for trial.[83] On May 23, 2018, the Court granted an order consolidating this case with *36 Builders, Inc., d/b/a Insight Homes v. Fairway Cap, LLC and Fairway Village Construction, Inc.*[84]

---

[81] Compl. B–D.

[82] Compl. A, E.

[83] The fraud claim was dismissed as duplicative of the breach of contract claim and for failure to comply with Court of Chancery Rule 9(b). The breach of fiduciary duty claim was dismissed without prejudice to allow Plaintiffs to move to amend their complaint at the close of discovery to state a claim for breach of a duty of disclosure should additional facts support such a claim. D.I. 67, Tr. of the Apr. 19, 2018, Oral Arg. and Rulings of the Ct. on Defs.' Mots. to Dismiss. While the Pretrial Order previews that Plaintiffs would seek to re-plead their breach of fiduciary duty claim, they never sought leave to do so. The pretrial briefs, trial and post-trial briefs focused only on the breach of contract claim.

[84] D.I. 66.

The *36 Builders* complaint was then dismissed by Stipulation of Dismissal on August 15, 2018.

Near the eve of trial, Plaintiffs moved for summary judgment and moved to exclude the expert report and related testimony of Leland Trice. Plaintiffs also moved to exclude the opinion evidence of Defendants' expert, Michael Morton, Esquire. Given the compressed time before trial, the Court deferred ruling on these motions until its post-trial decision. The one-day trial occurred on August 28, 2018. On October 10, 2018, Defendants made a post-trial motion to exclude supplemental and undisclosed expert opinion testimony from Joseph Della Torre. The parties presented post-trial oral argument on January 3, 2019. This is the Court's post-trial decision.

## II. ANALYSIS

As noted, the only claim tried to the Court was Plaintiffs' breach of contract claim. To succeed on that claim, Plaintiffs were obliged to prove: (1) the existence of a contract; (2) the breach of an obligation imposed by the contract; and (3) harm suffered as a result of the breach.[85] The parties agree that the community's governing documents constitute contracts between the developer and the homeowners. When considering a breach of contract claim in the real property

---

[85] *See Bakerman v. Sidney Frank Importing Co.*, 2006 WL 3927242, at *19 (Del. Ch. Oct. 10, 2006).

context, the Court must remain mindful that the law will facilitate the free use of land when not otherwise validly restricted.[86] Thus, Plaintiffs bore the burden at trial to identify where Fairway Cap was restricted in the use of its property, by positive law, contract or otherwise, and how those restrictions had been breached.[87]

### A. Plaintiffs Cannot Prevail on Their Breach of Contract Claim by Proving Defendants Breached the Contract Plaintiffs Thought They had Made

Plaintiffs urge the Court to begin its analysis of their breach of contract claim by stepping back and viewing the governing documents for this Residential Planned Community in a macro sense through their eyes. In this regard, Plaintiffs maintain that this orientation is justified, if not mandated, by our Supreme Court's decision in *Chicago Bridge*, where the Court emphasized the importance of "giving sensible life to a real-world contract [by] read[ing] the specific provisions of the contract in light of the entire contract."[88]

---

[86] *Gammons v. Kennett Park Dev.*, 61 A.2d 391, 397 (Del. Ch. Sept. 2, 1948).

[87] *Id.* ("[T]he settled policy of the law . . . favors . . . plac[ing] the burden of establishing the existence and the right to the benefit of a restriction upon him who asserts it."); *Alliegro v. Home Owners of Edgewood Hills, Inc.,* 122 A.2d 910, 912 (Del. Ch. May 23, 1956) ("It is well established that restrictions in deeds will be construed strictly against a person who seeks to place such impediments in the way of the normal purchase and sale of land."); *Regency Gp., Inc. v. New Castle Cty.,* 1987 WL 1461610, at *2 (Del. Ch. Dec. 3, 1987) (holding that restrictions on "the free use of property must be strictly construed.").

[88] Pls.' Opening Post-Trial Br. 38 (citing *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co.*, 166 A.3d 912, 913–14 (Del. 2017)).

Plaintiffs have seized upon what they like in *Chicago Bridge* but have ignored its core holding. *Chicago Bridge* provides an important reminder that our trial judges must be practical when engaging in contract construction; we cannot lose the forest for the trees. But Delaware has long adhered, and continues to adhere, to the objective theory of contracts.[89] In doing so, our courts interpret contracts by "standing in the shoes of an objectively reasonable third-party observer" who is bound to give ordinary meaning to the words used by parties and to enforce the agreements as written when that meaning can be readily discerned.[90] Thus, "[w]hile [our courts] have recognized that contracts should be 'read in full and situated in the commercial context between the parties,' the background facts cannot be used to alter the language chosen by the parties within the four corners of their agreement."[91]

Plaintiffs maintain they never would have bought homes in Fairway Village had they known the developer would change course from a Residential Planned Community to a community comprised of a mix of homeowners and home renters. They contend nothing in the governing documents gave them any indication Fairway Cap might pursue the townhouse rental plan it now seeks to implement. And they

---

[89] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232–33 (Del. 1987).

[90] *Dittrick v. Chalfant*, 2007 WL 3208783, at *4 (Del. Ch. Apr. 4, 2007).

[91] *Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 820 (Del. 2018) (citing *Chi. Bridge & Iron Co. N.V.*, 166 A.3d at 926–27).

appeal to the Court's sense of equity to right the wrong that has been done them.[92]

But equity is not so free-flowing that a court may yield it to correct every perceived unfairness. There must be a predicate wrong, and corresponding right of action, before equity will search for a remedy.[93] Thus, Plaintiffs' vague sense that Defendants plan to treat them unfairly will not suffice to justify the relief they seek. They must prove an actionable wrong. Here, they claim a breach of contract as the predicate wrong. For reasons explained below, however, they have not proven that any contract prohibits the conduct of which they complain. There is, therefore, no predicate wrong for equity to remedy.

## B. The Governing Documents Permit Defendants' Rental Plan

The governing documents make clear that a builder or developer in Fairway Village can own units to sell to the public or to rent for residential purposes. Indeed, the express references to, or implicit recognition of, an owner's right to rent its

---

[92] Pls.' Post-Trial Opening Br. 44; Pls.' Post-Trial Answering Br. 23. This argument came into even sharper focus during Plaintiffs' post-trial oral argument. *See, e.g.*, Post-Trial Oral Arg. Tr. 9–15, 19–20, 69–71 (unofficial transcript).

[93] DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY, at vii (1998) (listing the maxims of equity). *See Fischer v. Fischer*, 1999 WL 1032768, at *4 (Del. Ch. Nov. 4, 1999) ("Equity's appropriate focus should be the alleged wrong, not the nature of the claim which is no more than a vehicle for reaching the remedy for the wrong."); *Stewart v. Wilm. Tr. SP Servs., Inc.*, 112 A.3d 271, 304 (Del. Ch.), *aff'd*, 126 A.3d 1115 (Del. 2015) (internal citations omitted) ("That consideration is paramount in a court of equity, such as this Court, which 'will suffer no wrong without a remedy.'").

condominium unit for residential purposes throughout the governing documents are too numerous to recite.[94]

In addition to these more overt references, the documents contain provisions that reflect an understanding among developer and owners that all owners may regularly rent their townhouse units to residential tenants. For instance, in the Declaration, the definition of "Unit Owner" expands beyond individual owners "to include corporation[s], partnership[s], association[s], trust[s]."[95] This reflects an appreciation that owners who wish regularly to rent their units, including but not limited to the developer, may wish to do so through an entity rather than individually in order to limit their liability.[96]

---

[94] The references to leasing for residential purposes include, but are not limited to: JX 5 at 1 ("leasing of Units for residential purposes"); JX 3 § 9(a) ("Each Unit shall be used only for residential purposes . . . ; provided, however, that Developer shall be entitled to use a Unit or Units as 'models' or 'samples' for the purpose of selling or renting Units"); JX 7 § 5.16 ("The Developer or the Association may . . . adopt rules and regulations pertaining to the rental of Units. Owners of rented Units shall be personally liable for the failure of a tenant or any invitee of a tenant to abide by rules and regulations. . . . The Owners of any units shall obtain the approval of the Developer or the Association for any lease forms for the leasing of units"); JX 7 § 13.2 ("Every Unit Owner, within ten (10) days of entering into a lease or any other agreement for the occupancy or use of his Unit (including, but not limited to, any rental agreement that may be excluded under the Delaware Landlord Tenant Code under 25 *Del. C.* § 5102), shall supply a copy of any such lease"); JX 7 § 13.2 ("[N]o amendment to this Code of Regulations shall be adopted which . . . may materially or adversely interfere with or affect (i) the lease, sale, other disposition or use of any Unit(s) owned by Developer").

[95] JX 3 § 2(gg).

[96] *See* Tr. at 189 (Frabizzio) ("'Unit Owner' could mean the developer at some point in time if NVR walks. So the 'Unit Owner' is in fact the developer."); *id.* at 189–90 (Frabizzio) ("9(f) is there because it specifically provides that in the event that the

The Declaration's restrictive covenants are also instructive here. While Article 9(f) of the Declaration prohibits the owners from conducting certain commercial activities within the townhouse condominium units, it makes clear that this prohibition does not extend to residential uses.[97] Delaware courts have interpreted similar restrictive covenants, that expressly prohibit the conduct of "industry, business, trade, or occupation" within a residence, as not restricting the

---

developer is going to be taking a project forward and building, that the developer can do it for sale or rent. And in this particular provision of subsection (f), it provides that the right of the developer is reserved from the very beginning of the recordation of these documents; that if that event occurs, that the developer can put out in place 'For Sale' or 'For Rent' signs '. . . on any unsold or unoccupied units or at suitable places in the Common Elements. . . .'"); *id.* at 192–93 (Frabizzio) ("It appears in this paragraph 9(a) because I had some discussions with Tarlov's—either Ed Tarlov and/or his assistant at the time, Debbie Galonsky, and as the different versions of the documents transferred back and forth between Tarlov's office and my office, I wanted to make sure that type of protection was in there. And I made sure it went in there for the very purpose of what it says, that the developer can rent units.").

[97] JX 3 § 9(f) (The "[e]xcept for residential use permitted by paragraph 9(a)" clause limits the non-residential prohibition to industry, business, trade or occupation.). *See* Tr. at 189 (Frabizzio) ("[T]he developer can put out in place 'For Sale' or 'For Rent' signs '. . . on any unsold or unoccupied units or at suitable places in the Common Elements . . .'"). I note that after giving Plaintiffs all pleading stage inferences, I found this provision could be ambiguous when denying Defendants' Motion to Dismiss. But the extrinsic evidence and other provisions of the governing documents make clear that the prohibition does not extend to residential rentals. The fact that the developer is permitted by Article 9(a) of the Declaration to construct "Models" or "Samples" for the purpose of facilitating both sales *and rentals* provides further evidence that all parties knew or should have known that the developer could retain ownership of townhouse condominium units for the purpose of renting them. *See* Tr. at 192–93 (Frabizzio).

28

owner from renting the residence for residential purposes.[98]  Stated differently, a

prohibition against trade or business activities restricts only non-residential uses.[99]

According to Plaintiffs, Defendants' commitment to build and sell townhouse

condominium units on every lot it owns in Fairway Village is reflected in the recitals

of the Declaration.  Specifically, Plaintiffs point to the following recital as a clear

statement of this supposedly firm commitment: "grantor [Estates and its successors]

will offer Condominium Units for sale to the public."[100]

---

[98] In *Monigle v. Darlington*, the plaintiffs sought to prevent the defendant from operating a beauty shop in her home.  81 A.2d 129, 130 (Del. Ch. May 25, 1951).  Paragraph 1 of the community's restrictive covenants provided "the land shall be used for residence purposes only and no building of any kind whatsoever shall be erected or maintained thereon except private single dwelling houses and garages."  Paragraph 6 listed certain types of businesses that were not permitted on the property.  The plaintiffs argued that paragraph 1 required the land to be used for residence purpose only, and thus, no businesses should be allowed.  The court rejected the plaintiffs' arguments because "[i]f plaintiffs are correct, . . . the result would be to make [paragraph] 6 largely useless [and] unnecessary.  This result, however, must be avoided, if possible, since all the words in a deed are to be given effect if that is reasonably possible."  *Id.* at 131.  The court ultimately held paragraph 1 was a restriction on the type of structure that could be erected, whereas paragraph 6 was a restriction on the use of the premises.  Because the defendant's home satisfied the requirements of paragraph 1, and the beauty shop was not prohibited by paragraph 6, the court held that operating the beauty shop did not violate the restrictive covenants.  *Id.* at 131–32.  *See also Daniels Gardens v. Hilyard*, 49 A.2d 721 at 722 (Del. Ch. Nov. 20, 1946) (holding a covenant prohibiting any buildings except single family dwellings was a limitation on the type of building permitted and did not restrict the uses to which the property might be utilized).

[99] *See* Mark S. Dennison, J.D., *Construction and Application of "Residential Purposes Only" or Similar Covenant Restriction to Incidental Use of Dwelling for Business, Professional, or Other Purposes*, 1 A.L.R. 6th 135 § 8 (2005).

[100] JX 3, Schedule D.  Plaintiffs also note that Tarlov, as drafter of the governing documents, did not anticipate that the developer would retain homes or townhouse condominiums as rental units.  *See* Tr. 11 (Tarlov).  I have no reason to doubt that

29

Plaintiffs' argument misses the mark for two reasons. First, the recital Plaintiffs rely upon is not incorporated, either expressly or implicitly, in the Declaration or in any of the other governing documents. Instead, it dangles in a peripheral document as a non-binding statement of intent to place the purpose of the easement in context.[101] Second, the recital, at best, reflects the then-present intention of the developer to build and sell townhouses. It does not reflect a promise to refrain from all other permitted uses in perpetuity. The evidence reveals Fairway Cap, like its predecessor, went into Fairway Village with the intent to sell every townhouse it constructed. It tried very hard to do just that. It was only when those efforts failed, and an expert consultant recommended that Fairway Cap pursue a rental plan for the townhouses as an alternative strategy to extract value from the units, that Fairway Cap decided to pursue that strategy. Nothing in the recital even remotely suggests this course is prohibited.

After reviewing the governing documents and considering the evidence and arguments of counsel, I am satisfied Plaintiffs have failed to identify a contractual commitment made by Defendants to refrain from building and then renting to residential tenants townhouse condominium units on lots owned by Fairway Cap.

---

testimony. Nevertheless, the fact that Tarlov did not anticipate the developer's rental plans does not alter the fact that nothing in the governing documents prohibits those plans.

[101] *Gray v. Masten*, 1983 WL 142520, at *2 (Del. Ch. Aug. 16, 1983) (finding a recital is not a binding covenant).

30

Because this use of property is not prohibited by contract or otherwise, Plaintiffs' claim for breach of contract must fail.

Plaintiffs' claim that Defendants should be compelled to build townhouse units for rent that conform to units they built for sale likewise finds no support in the governing documents. Plaintiffs seem to be operating under the impression that Fairway Village is a heavily deed-restricted community. Not so. As the governing documents make clear, the developer and builders simply need to meet minimum square footage requirements.[102] Both parties agree that Defendants have complied, and plan to comply, with this mandate.[103]

## C. Defendants' Plan Will Not Result in an Impermissible Alteration of the Community's Governance Scheme

Plaintiffs argue that even if there is no express prohibition against a single owner retaining several townhouse units for the purpose of renting those units,

---

[102] The minimum livable square footage required (in R-2 or R-3 Zones) for a townhouse and/or single-family dwelling in Ocean View, Delaware is 1,250. JX 59. Neither the Community Constitution nor the Declaration for the Fairway Village Condominiums contains any minimum livable square footage for single-family dwellings and/or townhouses. JX 3, 5.

[103] The single-family dwellings in Fairway Village include a (a) house with 1,472 livable square feet at 31 Fairway Drive constructed in 2012; and (b) house with 1,521 livable square feet at 65 Golden Eagle Drive constructed in 2011 (the latter being 3 houses from the home subsequently purchased in 2014 by the Solomon Plaintiffs). Tr. at 171 (Solomon). Insight's "George Villa", a townhouse condominium, begins at 1,514 square feet. JX 76. Fairway Cap is constructing townhouse condominiums of 1,552 livable square feet as confirmed by the Town of Ocean View. JX 112, Ex. A.

Fairway Cap's rental plan cannot stand because it will effect a fundamental alteration of the community and its governance scheme. Plaintiffs further argue the rental scheme will leave Defendants in control of the Condominium Council, even though it was contemplated that control would be turned over to the homeowners. For example, Plaintiffs point to Section 13.2 of the Condominium's Code of Regulation, which provides that as long as the Developer owns a single unit, the Code of Regulations cannot be amended without Developer consent. According to Plaintiffs, since the veto power can be exercised at the Developer's "sole subjective and absolute option," the Defendants' plan to remain as owners of so many condominium units affords them perpetual authority to overcome the will of the other owners.[104]

---

[104] Pls.' Answering Post-Trial Br. 20–23 ("The Condominium and Community Associations will never have real control over Fairway Village. An attempted increase in condo fees for improvements can be vetoed by Fairway Cap simply by claiming that it adversely affects its units. Realistically, with Fairway Cap owning 76% of the condominium, it is [un]likely that anything it does not approve will ever see the light of day"). In arguing that Fairway Cap's retention of ownership improperly alters the community's governance scheme, Plaintiffs also point to Section 4.3 of the Community Constitution where the Developer's Class B voting rights are described, Section 5.7 of the Community Constitution where the Developer is exempted from paying assessments and Sections 5.9 and 5.10 of the Community Constitution which set forth certain financial obligations either not required of or satisfied by the Developer.

In this regard, Plaintiffs contend that this court's decision in *Council of Unit Owners of Pilot Point Condominium* is directly on point.[105] In *Pilot Point,* the developer of a condominium community planned to add substantially more units to the condominium than was disclosed to prospective purchasers, and planned to alter the community documents without an owner vote, using rights purportedly granted to the developer by the other owners via a power of attorney.[106] The court began its analysis by observing that the power of attorney did not give the condominium developer power to amend recorded documents to include additional units because the documents required the express approval of the owners themselves to accomplish the expansion.[107] The court then concluded that public policy demands that if a condominium developer intends to reserve the right unilaterally to make changes to the condominium project, then the developer must state as much, clearly and unambiguously, in the recorded documents governing the creation, development and operation of the condominium.[108]

---

[105] Pls.' Opening Post-Trial Br. 33–41 (citing *Council of Unit Owners of Pilot Point Condo. v. Realty Growth Inv'rs*, 436 A.2d 1268 (Del. Ch. Sept. 22, 1981), *aff'd*, *in part* 453 A.2d 450 (Del. 1982).

[106] *Council of Unit Owners of Pilot Point Condo. v. Realty Growth Inv'rs*, 436 A.2d at 1272.

[107] *Id.* at 1277.

[108] *Id.*

Here, Plaintiffs do not argue the prescribed voting rights for the condominium are ambiguous or otherwise unenforceable. Nor do they argue that Fairway Cap's voting control is expressly prohibited by any of the governing documents. Instead, invoking *Pilot Point*, they appeal to the Court's sense of equity and argue it is unfair for Fairway Cap to retain ownership of so many units that it effectively can strip control of the Condominium Council from the other homeowners.[109] Of course, Plaintiffs point to no language in the governing documents or any other basis in law to support their contention that Defendants were restricted from owning multiple condominium units and voting the percentage interests assigned to such units on a pro rata basis. Since I also find no support for the argument, I reject it as a matter of law.

The condominium units that Defendants will own and rent in Fairway Village are and will remain subject to all of the obligations imposed by the governing documents, including the obligation to pay the pro rata share of all assessments and fees in the community.[110] In addition, Defendants, along with every other owner, possess the right to vote a percentage interest based upon the pro rata interest

---

[109] Pls.' Opening Post-Trial Br. 32–33.

[110] JX 37; JX 38 Ex. 10 ¶ 5.

assigned to each unit in the condominium Declaration.[111] As Plaintiffs' expert, Michael Morton, Esquire, explained,[112] and as seen in the governing documents for the Florida condominium owned by Plaintiffs Ed and Lisa Leary, the Fairway Village governing documents could have prohibited a single owner from owning more than a designated number of units, limited the number of units that an owner can rent, or limited the time in a given year that a unit may be offered for rent.[113] They also could have limited the number of votes any given owner could cast, and thereby limit the influence any one owner could wield over the homeowners or condominium associations.[114] None of these restrictions appear in the Fairway Village governing documents. And Plaintiffs have offered no basis in fact, or in law,

---

[111] JX 7 § 2.9. I note Defendants will hold a 38% minority of the votes in the community-wide association once they own 127 condominium units, since the Developer's special class of voting rights expires in 2023. JX 5 § 4.3.

[112] While Morton cannot opine on matters of Delaware law, he is permitted to testify on custom and trade. D.R.E. 702. *See In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 740–741 (Del. Ch. Aug. 9, 2005), *aff'd*, 906 A.2d 27 (Del. 2006).

[113] Tr. at 230–32 (Morton); JX 63, Ex. 3; Defs.' Opening Post-Trial Br., Ex. A. The Florida condominium community amended its governing documents in 2014 to restrict (1) the number of units that may be held by a single entity as well as (2) the number of units that may be rented in the community at any particular time. Tr. at 153–54 (Torrini Leary); JX 63, Ex. 3; JX 96 §§ 17.7(b)(2) and 17.9.

[114] Condominium governing documents can clearly and expressly prohibit a party from owning a certain aggregate number of units in the subject community in order to prevent concentrated voting authority. *See* Tr. at 153–54 (Torrini Leary); Tr. at 230–32 (Morton); Defs.' Opening Post-Trial Br., Ex. A; JX 63, Ex. 3.

upon which the Court could justify writing these restrictions into the governing documents *ex post*.

## III.   CONCLUSION

Because I find that Defendants' plan to build, own and lease townhouse condominiums to residential tenants does not breach the Fairway Village governing documents, I must conclude that Plaintiffs have failed to prove a breach of contract. My verdict, therefore, is for the Defendants.  Plaintiffs' Motion for Summary Judgment is denied for the same reason.  Plaintiffs' Motion to Exclude Opinion Evidence of Michael Morton is granted in part and denied in part, as explained above.  Defendants' *Daubert* Motion to Exclude the Memorandum Expert Report and Related Testimony of Leland Trice and Defendants' Post-Trial Motion to Exclude Supplemental and Undisclosed Expert Opinion Testimony from Joseph Della Torre are denied as moot given the Court's verdict.  The parties shall confer and submit an implementing final judgment and order within ten (10) days.